2004 UT App 104

The VIEW CONDOMINIUM OWNERS ASSOCIATION, a Utah condominium association, Plaintiff and Appellant,

v.

MSICO, L.L.C., a Utah limited liability company; The Town of Alta, a political subdivision of the State of Utah; and John Does 1 through 10, Defendants and Appellees.

No. 20020746–CA.

Court of Appeals of Utah.

April 8, 2004.

Robert E. Mansfield and Stephen Christiansen, Van Cott Bagley Cornwall & McCarthy, Salt Lake City, for Appellant.

William H. Christensen and Lawrence B. Dingivan, Callister Nebeker & McCullough, Salt Lake City, for Appellees.

Before Judges BENCH, DAVIS, and JACKSON.

## OPINION

JACKSON, Judge:

¶1 The View Condominium Owners Association (The View) challenges the district court's denial of its motion for summary judgment and the district court's grant of summary judgment to MSICO, L.L.C. (MSICO) and the Town of Alta (Alta). We affirm in part and reverse and remand in part.

### BACKGROUND

¶2 The Sugarplum Planned Unit Development (Sugarplum PUD) comprises approximately 25 acres in Alta near the top of Little Cottonwood Canyon. On August 12, 1983, Sorenson Resources Company (Sorenson) recorded a plat of the Sugarplum PUD in the Salt Lake County Recorder's Office preliminary to developing the property. Sorenson simultaneously recorded a "Master Declaration of Covenants, Conditions, and Restrictions of Sugarplum, a Planned Unit Development" (the Declaration). In the "Recitals" section of the Declaration, Sorenson declared that "the Project shall be held, sold, con-

veyed ... and used subject to the following Declaration as to ... covenants, servitudes, restrictions, limitations, conditions and uses ... hereby specifying that such Declaration shall operate for the mutual benefit of all Owners of the Project and shall constitute *covenants to run with the land.*" (Emphasis added.)

¶ 3 Under the terms of section 1.25 of the Declaration, the Sugarplum PUD was divided into nine separate lots, "as shown on that certain map entitled 'SUGARPLUM, A PLANNED UNIT DEVELOPMENT' filed concurrently herewith in the office of the Salt Lake County Recorder, *as the same may be amended from time to time.*" (Emphasis added.) The amendment power referred to in section 1.25 was expounded upon in Article XIII of the Declaration. Section 13.1 accordingly states that, "[until] sale of the first Lot or Unit[,] Declarant shall have the right to amend this Declaration." Section 13.2 then states that, even after sale of the first lot, "Declarant shall have the sole authority at any time to amend this Declaration, and the Map, if necessary, for the purpose of allocating density to Lots owned by Declarant or *changing the configuration, size or location* of Lots owned by Declarant." (Emphasis added.)

¶ 4 Article III of the Declaration sets forth the "Use Restrictions" for the Sugarplum PUD. Under the terms of section 3.1, "[e]xcept as otherwise provided herein, each Lot may be used in any manner consistent with the requirements of applicable zoning.... Nevertheless, ... *Lot 5 shall be reserved for and improved with a parking facility* for the owners of Lot 4 and Lots 6–9 and the Units constructed thereon." (Emphasis added.)

¶ 5 On November 26, 1984, Sorenson recorded an Amended Sugarplum Plat (the Amended Plat). Under the terms of the Amended Plat, the configuration, size, and spatial relationships of the nine lots were significantly altered. Under the terms of the Amended Plat, the land previously designated as Lot 5 was now subsumed into the reconfigured Lots 6, 8, and 9. Significantly, approximately two-thirds of the land that had previously been recorded as Lot 5 was now included in the property allocated to the re-configured Lot 8. As a result, Lot 5 was reconstituted across the street from Lots 6, 7, 8, and 9 using land that had previously been part of Lot 4. Finally, the Amended Plat omitted the prior references to Lot 5 as a site for "parking and commercial development."

¶ 6 The View's predecessor in interest purchased Lot 8 of the Sugarplum PUD on January 4, 1985. MSICO purchased Lots 4, 5, and 9 on December 31, 1988.

¶ 7 Due to the high volume of snow that falls in the area each year, the town of Alta requires snow storage plans from property owners before building permits are issued. Preliminary to receiving approval for the Sugarplum PUD (and prior to the sale of any of the lots), Sorenson representative Walter Plumb (Plumb) sent a letter to the town of Alta to clarify Sorenson's

> intent with regard to snow storage at the [Sugarplum] project. During development of Lots 6 and 8 ... snow shall be stored in appropriate areas. Should there be any excess snow, it may be stored on Lot 9 as recorded. We recognize that storage areas may change as to utilize several alternatives ... that exist. Any changes shall be submitted at such time as we make applications for development in addition to our first one hundred units.

Alta subsequently reviewed the proposed snow storage plan and requested changes. On March 5, 1985, Alta informed the developer of The View that it had approved Lot 8 for development. This approval was predicated on the "understanding that adequate snow storage/removal has been addressed only for the first 100 units of the P.U.D. ... with substantial storage planned for Lot 9." On April 27, 1985, Alta approved a snow removal plan for Lot 8. Under the terms of this plan, Lot 9 was expressly designated as overflow snow storage for The View. Since 1985, The View has continuously used Lot 9 for snow storage.

¶ 8 In 1988, Sorenson filed suit against Plumb alleging that Plumb had fraudulently failed to disclose to Sorenson that he had granted the use of Lot 9 for overflow snow storage. In a subsequent settlement of this

action, Plumb agreed to "cooperate fully with and assist Sorenson with the removal of the snow storage designation of Lot 9."

¶ 9 In September 1996, MSICO filed suit against Alta. Among the causes of action listed in that suit were causes arising out of Alta's refusal to allow MSICO to develop Lot 9. On November 17, 1998, Alta sent a letter to the owners of The View to apprise them of the status of this litigation. In that letter, Alta stated that

"Lot 9" was designated by the developers of "The View" as the snow storage area for "Lot 8." *The Town granted construction approvals for The View based upon a snow storage plan designating "Lot 9" to receive snow from "Lot 8."* ...

[MSICO] is taking the position in the litigation against the Town that "Lot 9" has *not* been validly designated as snow storage for snow removed from "Lot 8" .... If [MSICO] succeeds in its claim that The View's snow storage plan is invalid insofar as it designated "Lot 9" to receive snow from "Lot 8," such a result *would have major implications for The View home owners.*

Snow storage is a life-safety issue in Alta. The Town has no choice but to require snow not be pushed into streets or impair emergency access or traffic. If the View Condominium Owner's Association were to lose its ability to store snow on sites approved in its snow storage plan, *the Town would have little choice but to take legal action to protect the public safety and welfare. That action might even include an injunction precluding occupancy of The View or portions thereof during snow periods.*

The Town vigorously disputes [MSICO]'s allegations that "Lot 9" is not validly dedicated as snow storage for "Lot 8," The View.

(First, third, and fourth emphases added.)

¶ 10 Pursuant to the litigation with MSICO, Alta filed a summary judgment motion, in which it argued that "[MSICO] cannot deny that its predecessor [Sorenson] sold Lot 9 to [MSICO] knowing that Lot 9 had been designated as snow storage." In a deposition in that case, Alta's Mayor testified that "Lot 9 was dedicated to snow storage by Walt Plumb in agreement with the planning commission." At a November 1999 town hearing arising out of the dispute, Alta's legal counsel testified that MSICO "knew there was a problem [arising out of the Lot 9 snow storage designation] as of 1988."

¶ 11 MSICO and Alta settled their dispute on November 9, 2000. As part of this settlement, Alta and MSICO purported to remove the designation of Lot 9 for The View's snow storage. Anticipating that The View would seek judicial enforcement of its snow storage rights, MSICO and Alta agreed that MSICO would defend and indemnify Alta from "assertions or claims that may be brought by owners of units in Lots 6, 7, or 8 of the Sugarplum PUD ... concerning a prior snow storage designation of Lot 9." Further, as part of the settlement agreement, Alta purportedly approved a new snow storage plan for Lot 9 which would largely eliminate the use of Lot 9 as a snow depository site.

¶ 12 On December 13, 2000, The View filed its complaint, alleging six causes of action against MSICO and Alta. In its complaint, The View sought to enforce what it believed to be a restrictive covenant guaranteeing its occupants the right to use the reconstituted Lot 5 as a parking facility. The View also sought to enforce its right to use Lot 9 as overflow snow storage. It predicated this assertion on four different legal theories: first, The View argued that it had a contract with MSICO and Alta allowing it to use Lot 9 as overflow snow storage; second, The View argued that principles of estoppel should be applied to prevent MSICO or Alta from contesting The View's right to store snow on Lot 9; third, The View argued that Alta's efforts to deprive it of its snow storage right on Lot 9 constitute a compensable taking; fourth, The View argued that MSICO had granted it an enforceable snow storage easement.

¶ 13 Following preliminary motions and discovery, The View filed a motion for summary judgment on the Lot 5 parking claim. MSICO/Alta responded with their own motion for summary judgment on all claims before the court. Following briefing and oral argument, the district court denied The

View's summary judgment motion and granted MSICO/Alta's motion for summary judgment. The View now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 14 Summary judgment is appropriate only if there is no genuine issue of material fact and, given the facts, the moving party is entitled to judgment as a matter of law. *See* Utah R. Civ. P. 56(c). "We review the trial court's decision to grant summary judgment for correctness, viewing the facts in the light most favorable to the losing party. We also review the trial court's determinations of law for correctness." *Fink v. Miller,* 896 P.2d 649, 652 (Utah Ct.App.1995) (quotations and citations omitted).

## ANALYSIS

### I. The View's Right to Enforce the Lot 5 Parking Agreement

¶ 15 The View first argues that the district court was incorrect in ruling that there was no enforceable covenant guaranteeing The View parking rights on the reconfigured Lot 5. We disagree.

¶ 16 It is well-established that, if recorded, the documents setting forth the plat designations for general plan developments can have the effect of creating restrictive covenants that are binding on all subsequent development. *See* Restatement (Third) of Property: Servitudes § 2.1 cmt. c (2000) ("Real-estate developments involving multiple parcels or units almost always include easements and covenants. Typically, the servitudes are set out in a separate document, often labeled a declaration."). However, "[r]ecording a declaration or plat setting out servitudes does not, by itself, create servitudes. So long as all the property covered by the declaration is in a single ownership, no servitude can arise. Only when the developer conveys a parcel subject to the declaration do the servitudes become effective." *Id.; see also id.* at § 2.14 cmt. a; 20 Am. Jur.2d *Covenants* § 163 (1995). Further, although subsequent purchasers may not have had an interest in the property at the time that the general plan was enacted, the law holds that those purchasers are entitled to enforce any covenants that may have been validly created. *See Fink v. Miller,* 896 P.2d 649, 652 (Utah Ct.App.1995) ("As a general proposition, property owners who have purchased land in a subdivision, subject to a recorded set of restrictive covenants and conditions, have the right to enforce such restrictions ...."); *see also* Restatement (Third) of Property: Servitudes § 1.7 cmt. a.

¶ 17 Under Utah law, "[a] covenant that runs with the land must have the following characteristics: (1) The covenant must 'touch and concern' the land; (2) the covenanting parties must intend the covenant to run with the land; and (3) there must be privity of estate." *Flying Diamond Oil Corp. v. Newton Sheep Co.,* 776 P.2d 618, 622–23 (Utah 1989) (footnote omitted). "Although the touch-and-concern and intent requirements are somewhat interrelated, the absence of any one of the requirements prevents a covenant from running with the land." *Id.* Further, " '[r]estrictive covenants are not favored in the law and are strictly construed in favor of the free and unrestricted use of property.' " *Dansie v. Hi–Country Estates Homeowners Assoc.,* 1999 UT 62,¶ 14, 987 P.2d 30 (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d 194, 198 (Utah 1991)).

¶ 18 There is no dispute in the present case as to whether the purported parking covenant touches and concerns the land, nor is there is a dispute as to whether privity of estate exists. Instead, the sole dispute is whether Sorenson intended Lot 5's designation as a parking space for Lot 4 and Lots 6, 7, 8, and 9 to act as a covenant that would run with the land. The district court ruled that there was no such intent. We agree.

¶ 19 Explaining the intent prong of the analysis, our supreme court has stated that "the original parties to the covenant must have intended that the covenant run with the land" in order for the covenant to be deemed binding on successive generations. *Flying Diamond Oil Corp.,* 776 P.2d at 627. Though "[a]n express statement in the document creating the covenant that the parties intend to create a covenant running with the land is *usually* dispositive of the intent is-

sue[,][t]he parties' intent may also be implied by the nature of the covenant itself." *Id.* (emphasis added). "Generally, unambiguous restrictive covenants should be enforced as written. However, where restrictive covenants are susceptible to two or more reasonable interpretations, the intention of the parties is controlling." *Swenson v. Erickson,* 2000 UT 16, ¶ 11, 998 P.2d 807. In cases of textual ambiguity, "interpretation of the covenants is governed by the same rules of construction as those used to interpret contracts." *Id.* Thus,

> [i]n the determination of the intention of the parties, the entire context of the covenant is to be considered. In construing the words of the covenant, the court is not limited to dictionary definitions, but the meaning of [the] words used is governed by the intention of the parties, to be determined upon the same rules of evidence as are other questions of intention.

20 Am.Jur.2d *Covenants* § 171.

 ¶ 20 The View first argues that the language of the Declaration was unambiguous and that the district court's reliance on extrinsic evidence in its examination of intent was therefore legal error. The relevant portions of the Declaration are: (1) section 3.1, which states that "Lot 5 shall be reserved for and improved with a parking facility for the owners of Lot 4 and Lots 6–9 and the Units constructed thereon"; (2) the Recitals section, which states that the terms of the Declaration "shall operate for the mutual benefit of all Owners of the Project and shall constitute *covenants to run with the land*" (emphasis added); and (3) section 13.2, which states that the "Declarant shall have the sole authority at any time to amend this Declaration, and the Map, if necessary, for the purpose of allocating density to Lots owned by Declarant or changing the configuration, size or location of Lots owned by Declarant."

¶ 21 Reading these three portions of the Declaration together, we see at least three different, equally plausible interpretations as to the scope and meaning of the Lot 5 parking agreement. First, one could plausibly read these provisions and conclude that, insofar as section 3.1 "reserves" Lot 5 as a parking lot for the occupants of Lot 4 and Lots 6, 7, 8, and 9, the amendment power reserved to Sorenson under section 13.2 was subject to the intra-contractual mandate that Lot 5 remain viable as a parking lot for the occupants of Lot 4 and Lots 6, 7, 8, and 9. Thus, section 13.2's general amendment power would be held subordinate to the parking agreement of section 3.1.

¶ 22 Second, one could plausibly read these provisions as MSICO does and conclude that Sorenson's reservation of the power to amend the "configuration, size[,] or location" of the Lot 5 designations clearly evidences an intent for the designation of Lot 5 as a parking lot to be a temporary designation, changeable by Sorenson at will. Under this reading, section 3.1's parking designation is thus subordinate to section 13.2's amendment power, thereby indicating that the parking agreement was an agreement that was at all times subject to extinguishment by the reserved amendment powers held by Sorenson.

¶ 23 Third, one could plausibly read these provisions as The View reads them and thus conclude that, because Sorenson retained the right to amend the "configuration, size[,] or location" of the respective lots, the covenant that Lot 5 be used as a "parking facility" for the other lots must mean that the right for the occupants of those other lots attaches to the most recent configuration of "Lot 5," regardless of whether its "configuration, size[,] or location" has been changed. In this manner, the various provisions of the contract would ostensibly be harmonized.

¶ 24 There are various strengths and weaknesses to each of these approaches. At the very least, however, the threshold plausibility of such disparate readings indicates that the parking agreement contained in the Declaration was ambiguous as to its scope and duration. As such, The View's argument that the district court erred by considering parol evidence in its determination of intent is simply incorrect.

¶ 25 Because of the intra-contractual ambiguity regarding the proper reconciliation of these various contractual provisions, the district court necessarily examined the evidence before it to determine whether, in the context of a summary judgment motion, it could

determine that the parties intended the permanent covenant language set forth in the Recitals section to apply to the parking agreement set forth in section 3.1 of the Declaration. The district court ruled that the evidence indisputably showed that the permanent covenant language was not meant to apply to the parking agreement and accordingly granted summary judgment on this issue. We agree.

¶ 26 To overcome a summary judgment motion, a party must present some direct evidence that would support its position. *See Thurston v. Workers Comp. Fund,* 2003 UT App 438, ¶ 16, 83 P.3d 391. Here, the *only* direct evidence that was presented below regarding the application of the permanent covenant language to the parking agreement was the testimony of Walter Plumb. As discussed above, Plumb testified that Sorenson did not intend for the Lot 5 parking designation to be permanent. Given Plumb's direct, personal involvement in this project, this evidence was highly probative and directly on point to the question at hand. As noted by the district court, The View has failed to provide *any testimony* from *any witness* who was similarly involved in the events that would rebut Plumb's testimony regarding Sorenson's intent, nor has The View offered any direct testimony or evidence of its own that would support a contrary position. In the absence of any proof to the contrary, Plumb's unrebutted testimony regarding the proper application of the permanent covenant language to the parking agreement is by itself sufficient to support the district court's conclusion that there is no genuine question of material fact on this issue.

¶ 27 Even were we to look beyond the direct evidence, however, the result would still be the same. As noted by the district court, the evidence indicates that The View's predecessors in interest purchased Lot 8 *after* Sorenson had created and recorded the Amended Plat. The changes made in the Amended Plat altered the boundaries, dimensions, and spatial relationships of the various lots, and virtually all of the changes support the conclusion that Lot 5's prior designation as a parking lot was now obsolete. For example, the property that had been designated as "Lot 5" in the original Declaration was parceled out in the Amended Plat so as to be completely subsumed into various other lots. The reconfigured Lot 8 received almost two-thirds of the land that had once been designated as Lot 5, allowing the owners of the reconfigured Lot 8 to use that land for whatever purpose, parking or otherwise, that they deemed optimal. Given that the land comprising the old Lot 5 had been absorbed by the other lots, an entirely new Lot 5 was created in the Amended Plat. Importantly, the new Lot 5 was now located across the street from the reconfigured Lots 6, 7, 8, and 9, thus reducing its usefulness as a parking space for the occupants of Lots 6, 7, 8, and 9. Finally, in contrast to the original plans set forth in the Declaration, the Amended Plat contained no references to Lot 5 as a parking facility.

¶ 28 These changes, both individually and collectively, are consistent with the district court's conclusion that the new Lot 5 was not meant to serve as a subservient parking lot for Lot 4 and Lots 6, 7, 8, and 9, but that it was instead intended for its own future development. In contrast, The View has not offered anything in rebuttal which would support the conclusion that, in spite of these massive changes to the plat designations, the new Lot 5 was still intended to be reserved as a parking lot for the use of the various other lots.[1]

---

1. Perhaps because of the uncontroverted nature of this evidence, The View urges us to hold that the parking agreement should be held applicable to whatever space of land is currently designated as "Lot 5." However, we think that reading the Declaration in this manner could potentially create absurd results. For example, instead of creating a new, sizeable Lot 5 across the street from the reconstituted Lot 8, Sorenson clearly could have reconfigured the lots so as to put Lot 5 on the other side of the development from Lot 8.

Such a move would have rendered Lot 5's use as a parking designation for the occupants of Lot 8 impractical. Indeed, under the amendment powers set forth in the Declaration, Sorenson could have gone even further. Sorenson could have chosen to create a "Lot 5" that was the size of a single family dwelling or even the size of a single parking stall. Such a downsizing of "Lot 5" would have rendered the Lot 5 parking agreement virtually meaningless. It is thus clear that, if the Lot 5 parking agreement were held to have

¶ 29 In sum, The View's entire argument on this issue is predicated on its own reconciliation of the various provisions contained in the Declaration. The questionable, patently ambiguous internal interplay between the competing contractual provisions, however, mitigates any probative impact that the individual provisions might have otherwise had. As a result, the district court correctly examined the extrinsic evidence, both direct and circumstantial, regarding Sorenson's actual intent with respect to the proper duration of the parking agreement. Insofar as this evidence uniformly and irrebutably supports the conclusion that the parking agreement was meant to be temporary, we conclude that the district court correctly granted summary judgment on this issue.

## II. The Lot 9 Snow Storage Agreement

¶ 30 The View next argues that the district court erred in granting summary judgment to MSICO and Alta on The View's claims that Lot 9 should have been reserved for snow storage. In its complaint, The View argued that relief was proper under principles of contract, easement, estoppel, and takings law. The district court dismissed each of these claims.

¶ 31 The View's contract claim is easily disposed of. There is no evidence in the record showing that any consideration was exchanged as part of the alleged contract between The View and Alta or MSICO regarding the Lot 9 snow storage. This alone is fatal to The View's assertion of contractual rights, *see Aquagen Int'l, Inc. v. Calrae Trust,* 972 P.2d 411, 413–14 (Utah 1998), and the district court therefore did not err in dismissing this claim.

¶ 32 However, The View's easement, takings, and estoppel claims warrant more serious examination. The district court offered only one explanation for dismissing The View's easement claim, holding that "[i]t is undisputed that no recorded dedication or easement affects Lot 9 reserving it for snow storage for the benefit of Lot 8." Assuming arguendo that this statement is true, it is nevertheless clear that a failure to record is not necessarily fatal to an easement claim. Under well accepted principles of law, non-recorded easements may be binding upon subsequent purchasers if the purchasers are under constructive notice that the easements exist. *See Johnson v. Higley,* 1999 UT App 278, ¶¶ 24–28, 989 P.2d 61. Thus, insofar as the district court's dismissal of The View's easement claim was based solely on an incorrect legal conclusion, that dismissal must be overturned.

¶ 33 We also conclude that the district court erred in dismissing The View's estoppel claim.

The elements essential to invoke equitable estoppel are: (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Eldredge v. Utah State Ret. Bd.,* 795 P.2d 671, 675 (Utah Ct.App.1990).

¶ 34 Here, viewing the evidence in the light most favorable to the non-moving party, we conclude that there was sufficient evidence brought forward to raise a question of material fact as to each of the estoppel

---

applied to whatever form Lot 5 ultimately took, Sorenson would have nevertheless retained the power to render the agreement completely useless by unchallengeable unilateral action. Under The View's own interpretation, then, the parking agreement contained in section 3.1 of the Declaration would have been a manifestly illusory contractual provision, thus rendering it void as a matter of law. *See Peirce v. Peirce,* 2000 UT 7, ¶ 21, 994 P.2d 193 ("When there exists only the facade of a promise, i.e., a statement made in such vague or conditional terms that the person

making it commits himself to nothing, the alleged 'promise' is said to be 'illusory.' An illusory promise neither binds the person making it, nor functions as consideration for a return promise.") (Quotations and citations omitted.). As such, we refuse to read the Declaration in such a manner so as to produce what would manifestly be a legally indefensible result. *See id.* at ¶ 19 (holding that courts should "endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract").

elements. The first element—whether Alta made a statement that was "inconsistent . . . with a claim later asserted"—is amply supported by (i) the designation of Lot 9 as overflow storage by Alta in April 1985 and (ii) the numerous statements made by Alta to The View during its own litigation with MSI-CO, in which Alta repeatedly asserted that Lot 9 had been validly dedicated as snow storage. Further, evidence presented below also indicates that these official statements were relied upon by The View in its long-standing use of Lot 9 as a storage space for its excess snow during the winter months. Viewed in the light most favorable to The View, this evidence raises a question of material fact as to the second estoppel factor. Finally, the evidence presented below indicating that The View's costs for snow storage are likely to increase if Lot 9 is no longer available for that purpose raises a question of material fact as to whether The View would suffer an "injury" if Alta is allowed to contradict its prior statements as required by the third estoppel factor. Thus, viewing the facts presented below in the light most favorable to The View, we conclude that the estoppel claim should not have been dismissed.[2]

 ¶ 35 Finally, we conclude that the district court erred in dismissing The View's takings claim. Under Utah law, "the takings analysis has two principal steps. First, the claimant must demonstrate some protectible interest in property. If the claimant possesses a protectible property interest, the claimant must then show that the interest has been taken or damaged by government action." *Strawberry Elec. Serv. Dist. v. Spanish Fork City*, 918 P.2d 870, 877 (Utah 1996) (quotations and citations omitted). Thus, a taking is "any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed." *Id.* (quotations and citations omitted).

 ¶ 36 Here, there is no dispute as to The View's property interest in the continued use and development of Lot 8, thus satisfying the first prong of the takings analysis.[3] The question then becomes whether that interest has been "taken or damaged by government action." *Id.* Viewing the facts in the light most favorable to The View and drawing all reasonable inferences in its favor, we think that this prong has been satisfied. Alta has previously asserted that removal of the Lot 9

2. In response, Alta argues that the estoppel claim is improper because it was asserted against a governmental entity. It is true that, "[a]s a general rule, estoppel may not be invoked against a governmental entity." *Anderson v. Public Serv. Comm'n*, 839 P.2d 822, 827 (Utah 1992). However, in Utah, "there is a limited exception to this general principle for unusual circumstances where it is plain that the interests of justice so require." *Id.* (quotations and citations omitted). In *Anderson*, the Utah Supreme Court explained the contours of the "unusual circumstances" exception. *Id.* There, the court explained that the "unusual circumstances" exception is applicable where there have been "very specific written representations by authorized government entities." *Id.* In *Celebrity Club, Inc. v. Utah Liquor Control Commission*, 602 P.2d 689 (Utah 1979), for example, the Utah Supreme Court held that a letter written by the Liquor Control Commission indicating that a private club was in compliance with applicable zoning regulations was sufficiently specific so as to allow an estoppel claim to proceed. *See id.* at 691. Similarly, in *Eldredge v. Utah State Retirement Bd.*, 795 P.2d 671 (Utah Ct.App.1990), we held that various oral and written statements by employees of the Utah State Retirement Board regarding another employee's employment history were specific enough so as

to warrant application of the unusual circumstances exception. *See id.* at 672–73. Here, Alta made numerous written representations to The View indicating that Lot 9 had been reserved for snow storage. These representations were supported by Alta's active assertion of this position in prior litigation. Due to the specificity of these representations, we conclude that the estoppel claim against Alta cannot be barred based on Alta's status as a governmental entity.

3. Alta argues that The View's takings claim should be rejected due to The View's lack of a property interest in Lot 9. This argument, however, misses the point of The View's actual takings claim. As discussed above, The View's takings claim is predicated on the damage that it would suffer as the result of possible legal or administrative action that would be taken against its properties on Lot 8 were the snow removal designation of Lot 9 changed. Though the harm to The View's interest in Lot 8 would naturally stem from the change in status of Lot 9, it is nevertheless clear that the protectible property interest at the heart of the takings claim is the interest that The View asserts in Lot 8 itself. Thus, the fact that The View lacks a distinct property interest in Lot 9 is not fatal to its takings claim.

snow storage designation would force it to initiate legal action against The View. In the November 17, 1998, letter that was sent to The View, Alta stated that, if the Lot 9 snow storage designation were removed, "the Town would have little choice but ·to take legal action to protect the public safety and welfare. That action might even include an injunction precluding occupancy of the View or portions thereof during snow periods." There is also conflicting evidence as to the validity and cost-impact of the revised snow storage plan approved as part of the November 2000 settlement between Alta and MSICO. Viewing this evidence in the light most favorable to The View, however, we are obligated to conclude that The View would be damaged by the removal of the Lot 9 snow storage designation. Accordingly, we conclude that The View did present sufficient evidence to raise questions of material fact, and the district court's dismissal of the takings claim must therefore be overturned.

### III. The View's Standing

 ¶ 37 Finally, in its responsive brief, MSICO and Alta assert that The View lacks standing to assert its claims. MSICO and Alta concede, however, that these claims were not raised below. "As a general rule, appellate courts will not consider an issue ... raised for the first time on appeal unless the trial court committed plain error or the case involves exceptional circumstances." *State v. Brown*, 856 P.2d 358, 359–60 (Utah Ct.App.1993). MSICO and Alta have not argued nor provided us with any authority suggesting that the standing issue qualifies under either exception. Accordingly, we decline to address the merits of this argument.

### CONCLUSION

¶ 38 For the foregoing reasons, we affirm the district court's dismissal of The View's claim regarding the existence of a Lot 5 parking covenant. We also affirm the district court's dismissal of The View's contract claim regarding the Lot 9 snow storage right. However, we reverse the district court's dismissal of the easement, estoppel, and takings claims regarding the Lot 9 snow storage right, and remand this case to the district court for further proceedings consistent with this opinion.

¶ 39 WE CONCUR: RUSSELL W. BENCH, Associate Presiding Judge and JAMES Z. DAVIS, Judge.