2005 UT 91

The VIEW CONDOMINIUM OWNERS ASSOCIATION, a Utah condominium association, Plaintiff, Respondent, and Cross–Petitioner,

v.

MSICO, L.L.C., a Utah limited liability company; and the Town of Alta, a political subdivision of the State of Utah, Defendants, Petitioners, and Cross–Respondents.

No. 20040369, 20040370.

Supreme Court of Utah.

Dec. 30, 2005.

Robert E. Mansfield, Stephen Christiansen, Salt Lake City, for plaintiff.

Merrill F. Nelson, Salt Lake City, for defendants.

PARRISH, Justice:

¶ 1 The View Condominium Owners Association ("The View") sued the Town of Alta and MSICO, L.L.C. ("MSI"), seeking to prevent construction of single family homes on lots 5 and 9 of the Sugarplum Planned Unit Development ("Sugarplum"), both of which are owned by MSI and located in Alta. With respect to lot 5, The View argued that restrictive covenants governing Sugarplum designated lot 5 as a parking area and that a subsequent amendment to the Sugarplum plat map did not alter that designation. With respect to lot 9, The View argued that Alta effectuated an unconstitutional taking of its property without just compensation when it amended a plan designating lot 9 for snow storage. The district court entered summary judgment against The View on both issues. The court of appeals affirmed the summary judgment on the parking issue, but concluded that disputed issues of material fact precluded summary judgment on the snow storage issue. The parties cross-petitioned this court for writs of certiorari, which we granted. We hold that the restrictive covenants were not abrogated by the recording of the amended plat and accordingly reverse the court of appeals' ruling on the parking issue. We similarly reverse the court of appeals' ruling on the snow storage issue, concluding that The View cannot establish the elements necessary to succeed on its claim of regulatory taking.

## FACTUAL BACKGROUND

¶ 2 The Sugarplum Planned Unit Development comprises approximately twenty-five acres in Alta, Utah. On August 12, 1983, Sorenson Resources Company ("Sorenson"), the developer of Sugarplum, simultaneously recorded two documents with the Salt Lake County Recorder. The first was a Master Declaration of Covenants, Conditions and Restrictions (the "Declaration") governing Sugarplum. The second was a plat map ("original plat") defining the location and dimensions of the individual Sugarplum lots and specifying their anticipated dwelling densities.

¶ 3 As originally envisioned, Sugarplum was divided into nine individual lots with common areas for roads and other shared uses. Under the Declaration, a planned road running roughly north and south provided access to lots 4 through 9. Lot 4 abutted the road's eastern edge, while lot 5 abutted the road's western edge. Lots 8 and 9 were also located west of the road, but they were offset so that access to them was available only by passing through lot 5.

¶ 4 The Declaration designated lot 5 as a parking area for the benefit of the units to be constructed on lot 4 and on lots 6 through 9. Sorenson retained the airspace rights above lot 5, to be developed as it saw fit; potential uses included "commercial, retail, residential, recreational."

¶ 5 The original plat also anticipated the use of lot 5 for parking. It contained a table entitled "Anticipated Dwelling Density," which listed the estimated number of residential units to be constructed on each of the nine lots. All lots, except lot 5, were assigned a tentative number of units. Lot 5

was assigned no units. Rather, the entry for lot 5 stated "Parking and Commercial Development of Air Space."

¶ 6 Before selling any of the lots, Sorenson recorded an amended plat map, which significantly altered the configuration, size, and spatial relationships of the nine lots. The amended plat moved lot 5 across the street so that it occupied land that previously had been part of lot 4. Lots 8 and 9 were shifted toward the road into the space previously occupied by lot 5 so that these two lots then abutted the planned road.

¶ 7 The amended plat also included changes to the table. The designation of lot 5 for "Parking and Commercial Development of Airspace" found on the original plat was eliminated, and lots 4 and 5 were listed together, with sixty-five units allocated between them. Sorenson, however, failed to make corresponding amendments to the Declaration, which designated lot 5 for parking and the development of airspace.

¶ 8 On January 4, 1985, The View's predecessor in interest purchased lot 8 as described in the amended plat. Despite the restrictive covenants contained in the Declaration, the parties did not contemplate a parking right on lot 5. Walter Plumb, Sorenson's corporate secretary, testified that the amended plat reflected plans to eliminate lot 5 as a parking structure and that Sorenson never intended to convey a parking right in that lot. Russell Watts, president of The View's predecessor in interest, who was directly involved in the purchase of lot 8 from Sorenson, testified that he neither bargained for nor intended to acquire a parking interest in lot 5.

¶ 9 After acquiring lot 8, The View's predecessor in interest sought a building permit from Alta. Because of the heavy annual snowfall in the Alta area, Alta required an acceptable plan for storing the snow on lot 8 as a condition of the permit. To facilitate the application process, Plumb wrote a letter to Alta dated February 27, 1985, in which he sought to clarify Sorenson's intent with regard to snow storage at Sugarplum. The letter stated that, during the development of lots 6 and 8, snow would be stored in the appropriate designated areas and that if

there should "be any excess snow, it may be stored on lot 9 as recorded." It also stated that areas designated for snow storage were subject to change and that any such changes would be submitted to Alta for approval when Sorenson applied for additional development in Sugarplum.

¶ 10 The Alta Planning Commission approved The View's application for a building permit on lot 8, contingent on its understanding that substantial snow storage had been planned for lot 9. On April 27, 1985, on the basis of the Commission's recommendation, Alta approved an official snow removal plan for The View that designated lot 9 for overflow snow storage, and The View began using lot 9 for that purpose.

¶ 11 On December 31, 1988, Sorenson deeded lots 4, 5, and 9 to MSI. Thereafter, various disputes arose between MSI and Alta regarding development of the three lots, culminating in MSI's filing a lawsuit against Alta in September 1996. One of the disputes related to Alta's refusal to allow MSI to develop lot 9 while that lot was designated as a snow storage area for use by The View. As part of that dispute, Alta sent The View a letter indicating that, if The View were to lose its ability to store snow on lot 9, Alta "would have little choice but to take legal action to protect the public safety and welfare," as "[s]now storage is a life-safety issue in Alta." The letter stated that "protect[ing] the public safety and welfare" would necessitate "an injunction precluding the occupancy of The View of lot 8 or portions thereof during snow periods."

¶ 12 MSI and Alta settled the suit in November 2000. As part of the settlement, Alta approved an alternate snow storage plan for lots 4, 5, 8, and 9. The alternate plan removed lot 9 as the designated location for snow storage for The View and allowed snow from lots 4, 5, 8, and 9 to be stored on five separate locations in and around Sugarplum. Under the settlement agreement, Alta also approved a development plan authorizing construction of ten single family homes on lots 4, 5, and 9.

¶ 13 In December 2000, The View sued MSI and Alta seeking to prevent construc-

tion on lots 5 and 9. The View sought to prevent construction on lot 9 under various legal theories, all of which were designed to establish that The View had a permanent right to store snow on that lot. Specifically, it argued that MSI and Alta breached a contract allowing it to use lot 9 as overflow snow storage and that MSI and Alta also breached the implied covenant of good faith and fair dealing that inhered in the contract. The View alternatively argued it had an easement to store snow on lot 9 and that the doctrine of estoppel prevented MSI and Alta from denying its right to store snow there. Finally, The View claimed that Alta's adoption of the revised snow storage plan constituted an unconstitutional taking of its property without just compensation.[1]

¶ 14 Following discovery, The View, MSI, and Alta all moved for summary judgment. The district court denied The View's motion for summary judgment on the parking and the snow removal issues and granted MSI/Alta's motion for summary judgment on both issues.

¶ 15 The court of appeals affirmed the district court's entry of summary judgment against The View with respect to its claim for parking on lot 5 and its contractual claims to store snow on lot 9. *The View Condo. Owners Ass'n v. MSICO, L.L.C.*, 2004 UT App 104, ¶ 38, 90 P.3d 1042. But it reversed the summary judgment entered against The View on its other claims relating to the snow storage issue. *Id.* Specifically, it found that disputed issues of material fact made summary judgment inappropriate on The View's claims of implied easement, estoppel, and taking without just compensation and remanded those claims to the district court for further proceedings. *Id.*

¶ 16 MSI and Alta jointly petitioned for a writ of certiorari, arguing that the court of appeals erred in denying summary judgment in its favor on The View's claims of implied easement, estoppel, and a constitutional taking. The View cross-petitioned, alleging that the court of appeals erred in affirming summary judgment in favor of MSI on its claim to a parking right on lot 5. We granted certiorari to consider only two issues.[2] First, did the court of appeals err in holding that the restrictive parking covenant for lot 5 was terminated by the plat amendment? Second, did the court of appeals err in holding that Alta's termination of the snow storage designation for lot 9 gave rise to a constitutional takings claim? We have jurisdiction pursuant to Utah Code section 78–2–2(3)(a). Utah Code Ann. § 78–2–2(3)(a) (2002).

## ANALYSIS

¶ 17 When reviewing a case on certiorari, we review the court of appeals' decision for correctness. *State v. Peterson*, 2005 UT 17, ¶ 8, 110 P.3d 699; *State v. Corwell*, 2005 UT 28, ¶ 10, 114 P.3d 569. "The correctness of the court of appeals' decision turns on whether that court correctly reviewed the trial court's decision under the appropriate standard of review." *State v. Dean*, 2004 UT 63, ¶ 7, 95 P.3d 276. When reviewing the trial court's interpretation of the Declaration, which presents a legal question, the court of appeals was obligated to apply a correctness standard. *Cf. Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.*, 2004 UT 54, ¶ 6, 94 P.3d 292. In reviewing a grant or denial of summary judgment, the court of appeals was obligated to "view the facts and all reasonable inferences drawn therefrom in the

1. MSI counterclaimed, arguing that The View had improperly used lot 9 to store snow without MSI's permission and without paying MSI appropriate compensation. MSI requested payment for the reasonable value of The View's use of lot 9 and an order requiring that The View cease using lot 9 for snow storage. The district court held that MSI's counterclaim was mooted by its grant of summary judgment in favor of MSI on The View's takings claim. Because we affirm the summary judgment in favor of MSI on that issue, and because neither party disputes the conclusion that summary judgment in favor of MSI on The View's takings claim rendered MSI's

counterclaim moot, we do not address MSI's counterclaim further.

2. Neither The View's claim of an implied easement to store snow on lot 9 nor its claim that Alta and MSI are estopped from denying it permission to store snow on lot 9 was encompassed within our order granting certiorari review. Disposition of those issues is therefore governed by the court of appeals' opinion, which directed that they be remanded to the district court for further consideration.

light most favorable to the nonmoving party" and to review the district court's legal conclusions, as well as the grant of summary judgment as a whole, for correctness. *Fericks v. Lucy Ann Soffe Trust,* 2004 UT 85, ¶¶ 2, 10, 100 P.3d 1200 (citation omitted). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Id.* ¶ 10; Utah R. Civ. P. 56(c).

¶ 18 The View contends that the court of appeals erroneously affirmed the district court's grant of summary judgment in favor of MSI on the lot 5 parking issue. Alta argues that the court of appeals erred in reversing summary judgment in its favor on the lot 9 takings claim. We address each contention in turn.

## I. THE VIEW'S RIGHT TO USE LOT 5 FOR PARKING

¶ 19 We first consider whether the court of appeals erred in holding that the plat amendment terminated the restrictive parking covenant applicable to lot 5. The court of appeals approached this issue by analyzing whether the lot 5 parking covenant qualified as a covenant "running with the land." *The View Condo. Owners Ass'n v. MSICO, L.L.C.,* 2004 UT App 104, ¶¶ 16–29, 90 P.3d 1042. The court concluded that the covenant did not run with the land because the covenanting parties did not intend it to do so. *Id.* ¶ 18. In reaching this conclusion, the court of appeals began with the proposition that the relevant time for determining intent was that point when Sorenson first conveyed a parcel subject to the Declaration. *Id.* ¶¶ 16–18. The court of appeals then examined the language of the Declaration in light of the amended plat, found that it was ambiguous, and therefore looked to extrinsic evidence of intent. *Id.* ¶¶ 20–26. From the extrinsic evidence, the court of appeals concluded that the parties did not intend the parking covenant to run with the land. *Id.* ¶¶ 25–26. It therefore upheld the district court's summary judgment in favor of MSI. *Id.*

¶ 20 The View argues that the court of appeals erred when it considered extrinsic evidence. It asserts that the Declaration unambiguously demonstrates the parties' intent to create a restrictive covenant burdening lot 5 and that it is entitled to enforce the Declaration according to its terms. At the heart of The View's argument is the notion that the amendment to the plat map, which reconfigured the sizes and locations of the Sugarplum lots, did not effectuate an amendment to the corresponding Declaration. We agree.

¶ 21 A servitude, such as a restrictive covenant, "is created . . . if the owner of the property to be burdened . . . conveys a lot or unit in a general-plan development or common-interest community subject to a recorded declaration of servitudes for the development or community." Restatement (Third) of Property: Servitudes § 2.1 (2000). We interpret the provisions of the Declaration as we would a contract. *Swenson v. Erickson,* 2000 UT 16, ¶ 11, 998 P.2d 807. If the Declaration is not ambiguous, we interpret it according to its plain language. *Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.,* 2004 UT 54, ¶ 11, 94 P.3d 292. We may resort to extrinsic evidence as an aid to construction only where there is an ambiguity. *See Swenson,* 2000 UT 16, ¶¶ 10–11, 998 P.2d 807. An ambiguity exists if the Declaration is "capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Fairbourn Commercial,* 2004 UT 54, ¶ 10, 94 P.3d 292 (internal quotation marks omitted).

¶ 22 The Declaration's initial recitals plainly state that the covenants, servitudes, and restrictions contained in the Declaration "shall constitute covenants to run with the land." Article 12.12 of the Declaration similarly provides that the "Declaration shall run with the land, and shall continue in full force and effect for a period of fifty (50) years." Article 3.1 of the Declaration states: "Lot 5 shall be reserved for and improved with a parking facility for the owners of Lot 4 and Lots 6–9 and the Units constructed thereon, subject to Declarant's reservation of the air space rights to Lot 5. . . ." Finally, the restrictive covenants of the Declaration expressly apply to lots 1 through 9 "as shown on that [plat map] . . . as the same may be

amended from time to time." We conclude that this language unambiguously creates a restrictive covenant that came into effect when Sorenson conveyed lot 5 to MSI.[3]

■ ¶ 23 In urging us to conclude otherwise, MSI relies on the plat amendment. While it concedes that the Declaration and original plat contemplated the use of lot 5 for parking, it argues that the amended plat eliminated the original lot 5, redrew the boundaries of the several lots, and used land from other lots to create a new lot 5 devoid of any use restrictions. Because the Declaration incorporates the amended plat by reference,[4] MSI argues that the plat amendment effected an amendment to the Declaration as well, a result that is consistent with the intent of the parties at the time Sorenson conveyed lot 8.

¶ 24 While we agree with MSI's core contention that the Declaration must be construed together with the amended plat, *see Rowley v. Marrcrest Homeowners' Ass'n*, 656 P.2d 414, 417 (Utah 1982), we disagree with the way in which MSI attempts to apply that principle here. First, MSI's argument ignores the language of the Declaration specifying that the restrictive covenants apply by their terms to any amended plats. Second, the argument presumes that the terms of the Declaration are in conflict with the amended plat. But they are not.

¶ 25 Nothing in the amended plat is inconsistent with use of the lot 5 surface area for parking. The table on the amended plat does not require that any units be constructed on lot 5. It specifies only that a maximum of sixty-five units may be distributed between lots 4 and 5. Moreover, the Declaration reserves the air space above lot 5 to Sorenson. Article 2.1.3 provides:

[Sorenson] hereby reserves unto itself, its successors and assigns, *the exclusive right to develop, build upon, lease, sell and otherwise use the air space above Lot 5 ....* [Sorenson] and/or transferee of the Air Space shall have the right to *construct any improvements therein for commercial, residential, retail, recreational or any other use permitted by applicable state and local law.* No owner of Lot 5 or any part thereof shall impair or restrict development of the Air Space, but shall cooperate fully with such development and execute any such further documents or agreements deemed necessary by [Sorenson] for the development of such space.

(Emphasis added.) Article 2.1.3 also provides for an easement over lot 5 for ingress and egress "by any other owners, lessees, guests, employees, contractors, invitees or customers of [Sorenson] *or any subsequent owner(s)* of the Air Space *or any improvements* constructed thereon" (emphasis added). In other words, the Declaration did not contemplate that lot 5 would be used exclusively for parking. Rather, it bifurcated lot 5 into two horizontal levels. While the bottom level was to be used for parking, the upper level could be used for any purpose selected by Sorenson or its successors in interest. In short, under the Declaration, parking and development on lot 5 are not mutually exclusive. Because the amended plat is not inconsistent with the restrictive parking covenant contained in the Declaration, we must reject MSI's claim that the plat amendment modified the Declaration, thereby eliminating its designation of lot 5 as a parking area.

■ ¶ 26 As additional support for its amendment by implication theory, MSI points to provisions in the Declaration allowing the developer to unilaterally amend the Declaration and the plat "for the purpose of

---

3. We note that the court of appeals' focus on whether the parking covenant was one "running with the land" is extraneous to the resolution of this issue. The question of whether a restrictive covenant "runs" with its appurtenant land arises only when a landowner seeks to convey the burdened land to another. *See, e.g., Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 620–23 (Utah 1989). In that circumstance, the restrictive covenant that encumbers the land is already in force. Here, however, while lot 5 was

subject to article 3.1 of the Declaration, it was not encumbered until Sorenson actually conveyed it to MSI, thereby creating the servitude. *See* Restatement (Third) of Property: Servitudes § 2.1 cmt. c.

4. The Declaration defines "Map" to mean the recorded plat, "as the same may be amended from time to time, and which is incorporated herein by this reference."

allocating density to Lots owned by the [developer] or changing the configuration, size or location of [such lots]." Relying on those provisions, MSI argues that the Declaration could be modified simply by amending the plat. We reject this argument as well. The fact that the Declaration vested the developer with the unilateral authority to amend the Declaration and the plat in order to alter the configuration, size, or location of the developer's own lots does not suggest that the developer could unilaterally terminate restrictive covenants through a plat amendment alone. Nor does it suggest that amendments to the plat would constitute de facto amendments to the Declaration itself—particularly where, as here, the amended plat is not inconsistent with the Declaration. While Sorenson may have had the right to unilaterally amend the Declaration prior to the sale of lot 8, the undisputed fact is that it never did so. And under the explicit terms of the Declaration, amending the Declaration subsequent to the sale of the first lot requires "the vote or written assent of a majority of the total voting power of the Master Association."

¶ 27 MSI also argues that the plat amendment demonstrates the intent and understanding of both The View and MSI that lot 5 not be subject to a restrictive parking covenant. Intent, however, is irrelevant because we conclude that the Declaration and the amended plat, when construed together, are subject to only one plausible meaning, namely, that the amended plat's reference to building units refers to development of lot 5's air space rather than to a revocation of the restrictive parking covenant. Well-settled law precludes us from considering extrinsic evidence to vary the terms of an unambiguous written agreement. The policy behind such law is particularly compelling here, where the written agreement, which concerns real property, has been recorded in the public records. Parties should be able to rely on documents of record without fear that their unambiguous provisions may be set aside on the basis of contrary extrinsic evidence of intent. *See Fairbourn Commercial,* 2004 UT 54, ¶¶ 10–11, 94 P.3d 292. We accordingly hold that there are no disputed issues of material fact and that The View, not MSI, is entitled to a judgment as a matter of law with respect to the existence of the lot 5 parking covenant. Utah R. Civ. P. 56(c).

¶ 28 Notwithstanding the existence of the parking covenant, MSI suggests that we affirm the result reached by the court of appeals on the alternative basis that the parking covenant has been abandoned. Because both the district court and the court of appeals ruled in favor of MSI on the parking claim, neither court reached MSI's alternative abandonment defense, and we decline to consider it in the first instance on certiorari review. MSI may, however, present it on remand.

## II. THE VIEW'S RIGHT TO STORE SNOW ON LOT 9

■ ¶ 29 We now turn to The View's constitutional takings claim against Alta. The View alleged that Alta's approval of the revised snow storage plan constituted a taking of The View's property without just compensation in violation of article I, section 22 of the Utah Constitution.[5] Utah Const. art. I, § 22. The court of appeals ruled in favor of The View on this issue, holding that the trial court erred in entering summary judgment in favor of Alta. In doing so, the court of appeals erred.

■ ¶ 30 A takings claim presents two distinct inquiries:

First, the claimant must demonstrate some [protectable] interest in property. If the claimant possesses a [protectable] property interest, the claimant must then show that

---

5.  In supporting their respective positions on the takings claim, The View and Alta rely solely on our takings jurisprudence under article I, section 22 of the Utah Constitution. Neither party relies on the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, *Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 41 L.Ed. 979 (1897). Similarly, neither attempts to delineate whether the Utah Constitution provides any more protection against a regulatory taking than does the United States Constitution. Consequently, we analyze the issue solely under our article I, section 22 jurisprudence. *See Bernat v. Allphin,* 2005 UT 1, ¶ 38, 106 P.3d 707 (refusing to address an issue inadequately briefed by the appellant).

the interest has been taken or damaged by government action. A taking is any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed.

*Strawberry Elec. Serv. Dist. v. Spanish Fork City,* 918 P.2d 870, 877 (Utah 1996) (citations and internal quotation marks omitted).

¶ 31 Constitutional takings claims fall into two categories: physical takings and regulatory takings. A "physical taking occurs ... when there is [either] a condemnation or a physical appropriation of property." *Philip Morris, Inc. v. Reilly,* 312 F.3d 24, 33 (1st Cir.2002). In contrast, "[a] regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given." *Id.* The View's claim falls into the latter category inasmuch as it argues that Alta's modification of the snow removal plan hampered its enjoyment of its property interest in lot 8.[6]

¶ 32 Pursuant to their police power, state and local governments may enact regulations that do not constitute an unlawful taking. In *Colman v. Utah State Land Board,* 795 P.2d 622 (Utah 1990), we recognized:

Many statutes and ordinances regulate what a property owner can do with and on the owner's property. Those regulations may have a significant impact on the utility or value of property, yet they generally do not require compensation under article I, section 22. Only when governmental action rises to the level of a taking or damage under article I, section 22 is the State required to pay compensation.

*Id.* at 627. In other words, a taking is not merely any interference with private property, but is a "substantial interference with private property which destroys or material-

ly lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed." *Id.* at 626 (citation omitted). Indeed, the police power allows government, "without compensation," to "regulate and restrain the use of private property when the health, safety, morals, or welfare of the public requires or demands it." *Id.* at 627. Regulations promulgated under that power "are not considered as appropriating private property for a public use, but simply as regulating its use and enjoyment." *Id.*

¶ 33 In light of these principles, we conclude that the court of appeals erred when it reversed the trial court's summary judgment in favor of Alta on The View's takings claim. While The View unquestionably has a protectable property interest in lot 8, there was no evidence that Alta's adoption of the revised snow storage plan substantially abridged or destroyed that right.

¶ 34 In reversing the summary judgment, the court of appeals relied on the possibility that Alta might initiate litigation seeking to enjoin The View from occupying lot 8 during snow periods. *The View,* 2004 UT App 104, ¶ 36, 90 P.3d 1042. But the possibility of such litigation was premised on The View's inability to obtain suitable alternative snow storage. The November 2000 settlement between Alta and MSI provided for such storage, thereby eliminating any basis for interfering with The View's use and enjoyment of lot 8 during winter months.

¶ 35 The court of appeals also found "conflicting evidence as to the validity and cost-impact of the revised snow storage plan" approved as part of the settlement between Alta and MSI. *Id.* The court of appeals therefore found itself "obligated to conclude that The View would be damaged by the removal of the Lot 9 snow storage designation." *Id.* Mere "damage" to a landowner caused by a

---

**6.** In analyzing the takings issue, we focus solely on The View's claim that Alta's adoption of the revised snow storage plan damaged its right to the use and enjoyment of lot 8. While The View also asserts a protectable property interest in lot 9, The View's ability to establish such an interest is dependent upon the outcome of its easement and estoppel claims, which await further devel-

opment in the district court. In any event, The View's claim that Alta engaged in an unconstitutional taking of its interest in lot 9 was not an issue encompassed within the scope of our certiorari review. *See Coulter & Smith, Ltd. v. Russell,* 966 P.2d 852, 856 (Utah 1998) (review on certiorari is circumscribed by the issues raised in the petitions).

municipal regulation, however, does not rise to the level of a taking. An increase in cost caused by revision of the snow removal plan does not make the revision a compensable taking, as it does not substantially interfere with lot 8 or destroy or materially lessen its value. *Colman,* 795 P.2d at 627.

¶ 36 In summary, the revised snow storage plan and its attendant cost do not prevent The View from engaging in any and all permissible uses of lot 8. Accordingly, even when viewed in the light most favorable to The View, the facts are insufficient to establish a regulatory taking. Alta was consequently "entitled to a judgment as a matter of law," Utah R. Civ. P. 56(c), and the court of appeals erred in concluding otherwise.

## CONCLUSION

¶ 37 The court of appeals erroneously concluded that the plat amendment modified the provisions of the Declaration. In fact, the Declaration and amended plat are consistent with one another and recognize The View's right to park on lot 5. The court of appeals also erroneously concluded that issues of material fact precluded summary judgment in favor of Alta on The View's takings claim. Even when viewed in the light most favorable to The View, the facts are insufficient to establish a taking, as Alta was acting squarely within its police powers when it modified the snow storage plan. We therefore reverse the court of appeals on both issues and remand the case for further proceedings consistent with this opinion. Specifically, we remand for entry of judgment in favor of Alta on the constitutional takings claim and in favor of The View on the lot 5 parking claim, subject only to MSI's abandonment defense. The View's claims of easement and estoppel on the parking issue, which were not encompassed in our grant of certiorari, are remanded for consideration on their merits in accordance with the opinion of the court of appeals.

¶ 38 Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

¶ 39 Having disqualified herself, Chief Justice DURHAM does not participate herein.