2022 UT App 23

## THE UTAH COURT OF APPEALS

NICK KELLY,
Appellant and Cross-appellee,

*v.*

TIMBER LAKES PROPERTY OWNERS ASSOCIATION,
Appellee and Cross-appellant,

AND

HOLLYVALE RENTAL HOLDINGS LLC,
Appellee.

Opinion
No. 20191079-CA
Filed February 17, 2022

Fourth District Court, Heber Department
The Honorable Jennifer A. Brown
No. 160500088

Russell A. Cline, Attorney for Appellant and
Cross-appellee

Jeremy C. Reutzel, James C. Dunkelberger, and Ryan
M. Merriman, Attorneys for Appellee and
Cross-appellant Timber Lakes Property Owners
Association

Todd W. Prall, Attorney for Appellee Hollyvale
Rental Holdings LLC

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

ORME, Judge:

¶1 To collect on past due assessments, Timber Lakes Property Owners Association (Timber Lakes) conducted a nonjudicial foreclosure on Nick Kelly's property, which Hollyvale Rental Holdings LLC purchased at auction. Following the sale, Kelly sought to set aside the trustee's deed to Hollyvale,

arguing, among other things, that Timber Lakes' failure to wait the statutory three-month period before publishing a notice of trustee's sale was against public policy and thus rendered the foreclosure sale void. He also argued that this failure to wait the full three-month period excused him from paying the past due assessments under the first-to-breach rule.

¶2    The district court concluded that the nonjudicial foreclosure did not violate public policy and granted summary judgment to Timber Lakes and Hollyvale on that claim. Kelly's remaining claims proceeded to a bench trial, at which Kelly presented what the court found to be a forged receipt as evidence that he had paid at least a portion of the assessments that Timber Lakes claimed were past due. Following the trial, the court found in Timber Lakes' favor and, based on a finding that following summary judgment Kelly pursued his claims in bad faith, awarded Timber Lakes its attorney fees incurred from the point of summary judgment onward. The court, however, denied Timber Lakes' request for attorney fees incurred prior to summary judgment.

¶3    Kelly appeals the court's grant of summary judgment, post-trial rulings, and the attorney fees award. As part of his challenge to the court's summary judgment order, Kelly raises an argument for the first time on appeal and requests that we review it for plain error. Timber Lakes cross-appeals the court's denial of its request for pre-summary-judgment attorney fees. We affirm the district court in every respect and further hold that, with limited exceptions, plain error review is not available in the civil context. We remand only for calculation of an award of attorney fees in favor of Timber Lakes, for attorney fees it incurred on appeal.

BACKGROUND[1]

¶4 Timber Lakes is the homeowners association that governs the Timber Lakes Estates development, located outside Heber City. Timber Lakes derives its authority as a homeowners association from the Declaration of Protective Covenants, Conditions, Restrictions and Management Policies for Timber Lakes Estates (the CC&Rs), which was recorded in Wasatch County in 1989. The CC&Rs have not been amended since their initial recordation.

¶5 Under the CC&Rs, each property owner within Timber Lakes Estates "is deemed to covenant and agree to pay" annual and special assessments to Timber Lakes, both of which "together with interest, costs and reasonable attorney fees shall be a charge on the land and shall be a continuing lien upon the property against which each such assessment is made." The CC&Rs further provide that for assessments that are over 90 days past due, Timber Lakes "may bring an action at law against the Owner personally obligated to pay the [assessments] or foreclose the lien against the property." Timber Lakes' bylaws,

---

1. This appeal arises from the district court's grant of summary judgment and from its findings of fact and conclusions of law following a bench trial. Accordingly, "in reviewing [the] court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts [corresponding to those issues] accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified). And "on appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts [corresponding to the issues arising from the bench trial] consistent with that standard and only present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Linebaugh v. Gibson*, 2020 UT App 108, n.5, 471 P.3d 835 (quotation simplified).

which were adopted in 1979, also provide that it is the duty of Timber Lakes' board of directors "[t]o foreclose the lien against any property for which assessments are not paid within ninety (90) days after due date or to bring an action at law against the Owner personally obligated to pay the same."

¶6     On November 17, 2011, Kelly purchased property within Timber Lakes Estates (the Property). Prior to closing on the sale, Kelly delivered a $1,000 money order to the seller's agent to cover unpaid assessments on the Property. And at the time of closing, the title company issued a check in the amount of $909.41 to Timber Lakes, $809.41 of which was designated as "delinquent dues" and the remaining $100 as a "transfer fee." Kelly also testified at trial that on November 24, 2011, he went into the Timber Lakes office and paid $1,839 in cash to cover current and future assessments. He provided a copy of a receipt at trial in support of this assertion.

¶7     On February 24, 2016, Timber Lakes, through counsel, sent Kelly a letter informing him that it intended to conduct a nonjudicial foreclosure on the Property to collect past due assessments and that Kelly could "prevent a foreclosure action" by contacting Timber Lakes and making payment arrangements. The letter also informed Kelly of his right to instead demand a judicial foreclosure. On May 2, 2016, Timber Lakes recorded a notice of default and election to sell against the Property (the Notice of Default). The Notice of Default indicated that Kelly had been informed of his right to request a judicial foreclosure at least 30 days prior and that he "did not request a judicial foreclosure." By July 2016, Timber Lakes' records indicated that Kelly owed over five thousand dollars in unpaid assessments, late fees, and interest. Its records did not reflect the $1,839 cash payment Kelly claimed to have made on November 24, 2011. And in early July 2016, Timber Lakes, again through counsel, recorded and published a Notice of Trustee's Sale that set August 1, 2016, as the public auction date.

¶8    On July 18, 2016, Kelly, who at the time was in Puerto Rico on business and had been away for "many months," was informed for the first time either by his daughter or by an employee that the Notice of Trustee's Sale had been posted on the Property. Kelly immediately called Timber Lakes' property management company, which conversation he recorded. Kelly told an agent of the property management company that although he "may owe something," it was not the amount that was alleged and that he was in Puerto Rico and needed time to retrieve supporting documentation. The agent informed Kelly that the Timber Lakes board of directors would be holding a meeting on August 17 and that she would request that Timber Lakes' counsel postpone the August 1 sale date until August 18 so that the board could consider further postponement of the sale at that meeting.

¶9    That same day, Kelly also spoke with a paralegal at the law firm that represented Timber Lakes, which conversation he also recorded. During that conversation, Kelly acknowledged, "I believe that we actually do owe for some HOA. But make no mistake, it might have been for partial of this year, and it might have been for a little bit of last year. But that's it." He also confirmed that he had documentation of prior payments but explained that they were not readily accessible because he was in Puerto Rico and was not due back for another three weeks.[2] He also stated that "if I need to call somebody, if I need to get my attorney on it to get something stopped before I get up there, I have no problem doing that."

¶10    Following the call, and at Kelly's request, the paralegal emailed Kelly "copies of statements, notices and return mail sent

---

2. In an email sent that same day to the agent of the property management company, Kelly indicated that he would not be able to return to Utah until September—at least a month and a half later. The agent replied that they would not be able to postpone the trustee's sale of the Property past August 18, 2016.

to the addresses" the law firm had on file for Kelly. The paralegal also informed Kelly,

> [W]e are not postponing the foreclosure sale date beyond August 18, 2016. You need to pay off the account in our office . . . or provide copies of your bank statements showing payments to Timber Lakes . . . [that] cleared your account along with copies of the front and back sides of all checks clearly showing they were cashed by Timber Lakes . . . or its agents.

¶11    The district court later found that "[a]side from making contact with Timber Lakes and its legal counsel and asking them to postpone the sale, [Kelly] took no affirmative action to enjoin the trustee's sale." The court further noted that "Kelly testified at the trial that he had family and friends who were available to him to either help him provide evidence of his claimed payments or to present payment to Timber Lakes. He chose not to have them do so." And despite having claimed he had an attorney, Kelly did not engage counsel to enjoin the trustee's sale.

¶12    The Timber Lakes board of directors held its scheduled meeting on August 17, 2016. The board discussed the pending trustee's sale of the Property but decided against postponing the sale any further. The trustee's sale of the Property took place the next day, on August 18, 2016. Hollyvale, the highest bidder, purchased the Property at auction.

¶13    In September 2016, Kelly filed suit against Timber Lakes and Hollyvale seeking to set aside the trustee's deed to Hollyvale as void and to quiet title in the Property. Kelly also asserted, among other things, claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Timber Lakes. He later amended his complaint to add a claim for mistake against both defendants and a request for an accounting against Timber Lakes. Timber Lakes counterclaimed

for declaratory judgment on the validity of the sale and for an award of attorney fees.

¶14   In early 2017, all three parties filed motions for partial summary judgment, seeking "a determination by the Court regarding the validity of Timber Lakes' trustee's sale" of the Property. Kelly argued that the sale was "void because the trustee did not wait the statutorily required time before giving 'notice of sale.'" Specifically, Kelly argued that the trustee was statutorily required to wait at least three months after recording the Notice of Default before giving the Notice of Trustee's Sale. *See* Utah Code Ann. § 57-1-24 (LexisNexis 2020). But here, the Notice of Default was recorded on May 2, 2016, and the Notice of Trustee's Sale was recorded and published in early July 2016—approximately one month short of the requisite three-month waiting period. Alternatively, he argued that the premature recordation of the Notice of Trustee's Sale rendered the sale voidable. Timber Lakes argued "that the sale is valid because it substantially complied with the notice requirements."

¶15   The district court denied Kelly's motion and granted Timber Lakes' and Hollyvale's motions on the ground that the sale of the Property was not void or voidable. The court concluded that the trustee's deed was not void because recording the Notice of Trustee's Sale approximately one month early did not rise to the level of violating public policy. The court further held that Kelly had not demonstrated the sale was voidable because he had "not alleged that the alleged defect in the Sale deprived [him] of the right to cure [his] default or bring an injunction to challenge the adequacy of the notice prior to the Sale." Indeed, it was undisputed that Kelly had actual notice of the sale as early as July 18, 2016, but "did nothing to enjoin it." The court further ruled that even if the sale was voidable, "Hollyvale's status as a bona fide purchaser defeats [Kelly's] motion." Accordingly, the court dismissed Kelly's claim seeking to set aside the sale of the Property and all claims Kelly asserted against Hollyvale. But the court allowed Kelly's remaining claims for damages against Timber Lakes, premised on theories

of breach of contract, breach of the covenant of good faith and fair dealing, and entitlement to an accounting, to go forward.

¶16   Around that same time, Kelly also moved for leave to amend his complaint for a second time to add a claim against Timber Lakes for failure to comply with applicable statutes, specifically Utah Code sections 57-1-24 to -26 governing nonjudicial foreclosure of trust deeds. Following a hearing on the matter, the court denied Kelly's motion to substantively amend his complaint.

¶17   In July 2018, the case proceeded to a three-day bench trial on the remaining claims. Regarding his claim for breach of contract, Kelly argued that he was excused from paying the assessments because Timber Lakes was the first to breach the contract when it failed to wait three months after recording the Notice of Default before posting the Notice of Trustee's Sale. Kelly also provided evidence that he had paid the assessments, including his testimony and a copy of a receipt dated November 24, 2011—Thanksgiving Day—indicating that he had paid $1,839 in cash to the Timber Lakes office for current and future assessments. To rebut this evidence, Timber Lakes provided bank records showing no deposit reflecting Kelly's claimed payment. Timber Lakes also called a handwriting expert, who testified that the receipt was a forgery. Finally, it introduced evidence that the Timber Lakes office was closed on November 24 for the Thanksgiving holiday and therefore no one would have been on hand to receive payments on that day or issue receipts.

¶18   In February 2019, the district court extended its findings of fact and conclusions of law, ruling against Kelly on all claims. As relevant to this appeal, the court held that Kelly's first-to-breach argument "ignores the reason for the Notice of Default and . . . Notice of the Trustee's Sale in the first place." And "[u]nless [Kelly] could demonstrate to the Court that he actually had paid his dues," which burden Kelly had not satisfied, "he would be in the position of having been the first to

breach the contract." The court found that Kelly's testimony "had some credibility issues," while the handwriting expert "was highly qualified, and credible in his testimony." Accordingly, the court found that Kelly "never actually paid [his] dues and may have attempted to perpetrate a fraud on this Court by relying upon a forged receipt to claim that [he] had." Based on these findings, the court held that Timber Lakes was not the first party to breach the contract.

¶19 Timber Lakes then sought attorney fees under Utah Code section 78B-5-825 (the bad faith statute) and the CC&Rs and bylaws. The court held that the CC&Rs and bylaws did not apply "to this somewhat unique situation regarding litigation after a foreclosure sale has occurred, given that they are drafted to apply to collection efforts up to and including a foreclosure." The court further noted that this "result is . . . somewhat equitable, given that it is undisputed that Timber Lakes did not comply with the foreclosure statute in terms of the notice of sale. Although the Court did find that the sale was valid, that finding was based primarily on the existence of a bona fide purchaser and the timing of Mr. Kelly's objections." But based on the forged receipt, the court determined that the bad faith statute was satisfied and awarded Timber Lakes attorney fees it "incurred from the point of the court's summary judgment ruling through trial and post-trial briefing on the attorney's fees issue."

¶20 Kelly appeals, and Timber Lakes cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶21 Kelly raises several issues on appeal. First, he argues that the trustee's sale of the Property is void because Timber Lakes lacked the statutory and contractual authority to conduct a nonjudicial foreclosure sale. Kelly acknowledges that this

argument is unpreserved, but he contends that the plain error exception to our preservation rule applies.[3] Timber Lakes counters by arguing that plain error review is unavailable in civil cases. For the reasons discussed in Section I below, we agree with Timber Lakes and decline to address the merits of Kelly's argument through the lens of plain error.

¶22    Next, Kelly argues that the district court erred in failing to declare the trustee's sale void on summary judgment. "We

---

3. Alternatively, Kelly asserts that the exceptional circumstances exception to our preservation rule applies. "We apply the exceptional circumstances exception to reach an unpreserved issue where a rare procedural anomaly has either prevented an appellant from preserving an issue or excuses a failure to do so." *State v. Van Huizen*, 2019 UT 1, ¶ 22, 435 P.3d 202 (quotation simplified). If a rare procedural anomaly exists, "it opens the door to a deeper inquiry" in which courts consider additional factors, such as "(a) whether the failure to address an unpreserved issue would result in manifest injustice, (b) whether there is a significant constitutional right or liberty interest at stake, and (c) judicial economy." *Id.* ¶ 22 n.4 (quotation simplified). Here, Kelly does not discuss the threshold inquiry of the exceptional circumstances exception. Instead, he merely asserts that permitting Timber Lakes to conduct an unauthorized nonjudicial foreclosure would result in a "manifest injustice" because "like lack of subject matter jurisdiction, lack of authority or a violation of statute should be a defense that can be raised at any time." Because Kelly has not demonstrated that a rare procedural anomaly prevented or excused him from raising this argument before the district court, he has not shown that exceptional circumstances overcome our preservation rule.

To the extent Kelly argues that, like subject matter jurisdiction, a lack-of-authority argument should not be subject to our preservation rule, he cites no authority in support of this contention and has thus not carried his burden of persuasion on appeal. *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196.

review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 6, 286 P.3d 301 (quotation simplified).

¶23　Kelly also contends that the district court erred in concluding, following a bench trial, that Timber Lakes was not the first to breach the contract and that it did not breach the implied covenant of good faith and fair dealing. "Following a bench trial, we review a trial court's legal conclusions for correctness, according the trial court no particular deference." *Camco Constr. Inc. v. Utah Baseball Academy Inc.*, 2018 UT App 78, ¶ 36, 424 P.3d 1154 (quotation simplified). We review the court's findings of fact for clear error, granting "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (quotation simplified).

¶24　Finally, both Kelly and Timber Lakes challenge the district court's attorney fees award. Kelly argues that the court misapplied the bad faith statute when it awarded attorney fees incurred by Timber Lakes after the entry of summary judgment in its favor. "We review a trial court's grant of attorney fees under the bad faith statute as a mixed question of law and fact." *Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 16, 405 P.3d 807 (quotation simplified). A party is entitled to attorney fees under the bad faith statute when an action or defense is both "(1) without merit, and (2) not brought or asserted in good faith." *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 46, 86 P.3d 712. "The 'without merit' determination is a question of law, and therefore we review it for correctness." *Fadel*, 2017 UT App 165, ¶ 16 (quotation simplified). "A finding of bad faith is a question of fact and is reviewed by this court under the clearly erroneous standard." *Id.* (quotation simplified). Furthermore, "because the good faith element implicates fact-intensive questions about the losing party's subjective intent, a lower court's finding on this element typically will be afforded a substantial measure of discretion." *Linebaugh v. Gibson*, 2020 UT App 108, ¶ 23, 471 P.3d 835 (quotation simplified).

¶25 And on cross-appeal, Timber Lakes argues that the district court erred in determining that it was not entitled, under the CC&Rs and bylaws, to all attorney fees it reasonably incurred in defending against Kelly's action. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Martin v. Kristensen*, 2019 UT App 127, ¶ 31, 450 P.3d 66 (quotation simplified), *aff'd*, 2021 UT 17, 489 P.3d 198. *See Brady v. Park*, 2019 UT 16, ¶ 32, 445 P.3d 395 ("[L]egal questions that pertain to the attorney fees issue . . . are reviewed for correctness.").

ANALYSIS

I. Plain Error Review in Civil Cases

¶26 Kelly argues that Timber Lakes lacked statutory and contractual authority to conduct a nonjudicial foreclosure on the Property. Specifically, Kelly points to the Utah Community Association Act (the UCAA). *See generally* Utah Code Ann. §§ 57-8a-101 to -703 (LexisNexis 2020). The UCAA, which our Legislature enacted in 2004, grants homeowners associations statutory liens on properties for unpaid assessments and costs of collection. *See id.* § 57-8a-301(1)(a). To enforce the statutory lien under the UCAA, "an association may . . . cause a lot to be sold through nonjudicial foreclosure as though the lien were a deed of trust." *Id.* § 57-8a-302(1)(a). It further provides that associations that predate the UCAA's 2004 enactment "may amend the declaration to make applicable to the association a provision of this chapter." *Id.* § 57-8a-107(1).

¶27 Kelly argues that Timber Lakes lacked the statutory authority to conduct a nonjudicial foreclosure on the Property because it never amended the CC&Rs to adopt the relevant provisions of the UCAA authorizing nonjudicial foreclosure for unpaid assessments. Indeed, the CC&Rs had never been amended since their initial recordation in 1989. Kelly additionally argues that Timber Lakes lacked contractual

authority to conduct a nonjudicial foreclosure on the Property because the CC&Rs limit Timber Lakes to two remedies for unpaid assessments: (1) bringing an action at law against the property owner personally or (2) bringing an action at law to foreclose the lien, which he asserts is limited to judicial foreclosures.

¶28 Kelly concedes that he did not preserve these issues before the district court and accordingly asks us to review them under the plain error doctrine. Timber Lakes counters, challenging the application of plain error review in the civil context. We agree with Timber Lakes and therefore have no occasion to consider the merits of Kelly's argument.

¶29 "The plain error standard of review is typically raised in the context of a criminal proceeding," and "it is generally unusual for a party to raise the plain error standard in a civil matter." *Danneman v. Danneman*, 2012 UT App 249, ¶ 10 n.5, 286 P.3d 309. Indeed, "there is an ongoing debate about the propriety of civil plain error review." *Utah Stream Access Coal. v. Orange Street Dev.*, 2017 UT 82, ¶ 14 n.2, 416 P.3d 553. Our Supreme Court has stated that, in the absence of an opportunity to address the question head on, it neither endorses nor repudiates "the ongoing viability of plain error review in civil cases." *Id.* And although Utah appellate courts have occasionally applied plain error review in civil cases, they have been careful to emphasize that they did so only because neither party challenged the applicability of the plain error doctrine in those cases. *See, e.g.*, *H&P Invs. v. iLux Cap. Mgmt. LLC*, 2021 UT App 113, ¶ 21 n.2, 500 P.3d 906; *Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶ 39 n.11, 499 P.3d 894; *Miner v. Miner*, 2021 UT App 77, ¶ 11 n.3, 496 P.3d 242; *Cook Martin Poulson PC v. Smith*, 2020 UT App 57, ¶ 22 n.3, 464 P.3d 541; *Tronson v. Eagar*, 2019 UT App 212, ¶ 18 n.7, 457 P.3d 407; *Gerwe v. Gerwe*, 2018 UT App 75, ¶ 6 n.1, 424 P.3d 1113; *Danneman*, 2012 UT App 249, ¶ 10 n.5.

¶30　Here, however, Timber Lakes directly challenges the availability of plain error review in civil cases. Accordingly, we must consider this important, oft-avoided question before we can reach the merits of Kelly's unpreserved argument. We begin by discussing the context and policy considerations in which the plain error standard developed in Utah and conclude by determining whether, given the context and policy considerations behind the standard, it is applicable in civil cases.

¶31　"Our appellate system has developed along the adversarial model, which is founded on the premise that parties are in the best position to select and argue the issues most advantageous to themselves, while allowing an impartial tribunal to determine the merits of those arguments." *State v. Johnson*, 2017 UT 76, ¶ 8, 416 P.3d 443. *See* Robert J. Labrum, *History and Application of the Plain Error Doctrine in Utah*, 2000 Utah L. Rev. 537, 537–38 (2000) [hereinafter Labrum] (identifying as a basic premise of the adversarial model "that out of the sharp clash of proofs presented by adversaries is most likely to come information from which a neutral and passive decision maker can resolve a litigated dispute in a manner that is acceptable both to the parties and to society") (quotation simplified). Put differently, "[u]nder our adversary system, the responsibility for detecting error is on the party asserting it, not on the court." *Patterson v. Patterson*, 2011 UT 68, ¶ 16, 266 P.3d 828. *See Johnson*, 2017 UT 76, ¶ 14 ("Under our adversarial system, the parties have the duty to identify legal issues and bring arguments before an impartial tribunal to adjudicate their respective rights and obligations.").

¶32　In the appellate context, this responsibility explains our preservation rule, which provides that "[w]hen a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue[.]" *Johnson*, 2017 UT 76, ¶ 15. "This system preserves judicial economy and fairness between the parties." *Id.* ¶ 8. Our preservation rule promotes judicial economy in that it, among other things, "encourages parties to resolve their controversies at

the trial level," "allows the trial judge to correct errors at the trial level," establishes a comprehensive record for appeal, and helps alleviate the otherwise heavy burden on appellate courts. *See generally* David William Navarro, *Jury Interrogatories and the Preservation of Error in Federal Civil Cases: Should the Plain-Error Doctrine Apply?*, 30 St. Mary's L.J. 1163, 1173–76 (1999), *cited in Utah Stream Access Coal.*, 2017 UT 82, ¶ 14 n.2. The rule also promotes fairness between the parties because if no objection was made in the trial court, "the adverse party would not be compelled to overcome the objection by presenting a rebuttal, providing an alternative argument, establishing an alternative defense, or introducing new evidence in an effort to overcome such an objection." *Id.* at 1175. By extension, "that party would be restricted from introducing new evidence, defenses, and factual arguments in an appellate court in order to rebut or defend an unpreserved issue." *Id.*

¶33 Historically speaking, the adversarial model is the product of merging two separate methods of review under the old English court system: the writ of error and the appeal in equity. *Johnson*, 2017 UT 76, ¶¶ 9–10. The writ of error was applicable to rulings from the English courts of law and was "strictly limited to reviewing orders and judgments made by the court of law on issues raised in that court." *Id.* ¶ 9. Conversely, the appeal in equity applied to the review of rulings from the English courts of equity. *Id.* Under this method of review, "appellate courts in equity were free to consider any issue de novo and developed flexible procedures to address the needs of individual cases." *Id.* (quotation simplified). For example, one of the procedures applied in appeals in equity "was the device of rehearing, which allowed the court to address new facts or law not originally raised by the parties." Barry A. Miller, *Sua Sponte Appellate Rulings: When Courts Deprive Litigants of an Opportunity to Be Heard*, 39 San Diego L. Rev. 1253, 1263–64 (2002), *cited in Johnson*, 2017 UT 76, ¶¶ 9–11.

¶34 While the adversarial model employed in most American appellate courts today more closely resembles the writ of error

method of review, *Johnson*, 2017 UT 76, ¶ 10, the model's appeal-in-equity roots are still present insofar as appellate courts "retain [the] discretion to balance the need for procedural regularity with the demands of fairness," *id.* ¶ 12 (quotation simplified). *See id.* (stating that "there is widespread agreement that appellate courts have the authority to" address issues that were not raised in the district court) (quotation simplified). Consequently, "[a]ppellate judges across the country have wrestled with the correct balance between law and equity and the scope of review on appeal." *Id.* ¶ 11. Thus, "[i]n an effort to serve the policy considerations of judicial economy and fairness to the parties, to preserve the adversarial model, and to provide clear guidelines to litigants," appellate courts have resolved this tension by "limit[ing] [their] discretion by creating exceptions to the general preservation rule." *Id.* ¶ 13. And so an appellate court will address an unpreserved issue only if the appellant establishes that an exception to the preservation rule applies. *Id.* ¶ 19. The three exceptions generally recognized in Utah are plain error, ineffective assistance of counsel, and exceptional circumstances. *Id.* Only plain error merits discussion here.

¶35   Under the current iteration of the plain error standard of review, "a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *Id.* ¶ 20 (quotation simplified). In Utah, the gradual development of the plain error standard had its genesis in the criminal context in 1931, when our Supreme Court stated in *State v. Stenback*, 2 P.2d 1050 (Utah 1931), that, in capital cases, the Court "may and should sua sponte consider manifest and prejudicial errors which are neither assigned nor argued."[4]

---

4. This early version of the plain error standard of review differs from the current version in several respects, but most notably the early version permitted an appellate court to sua sponte review the record for errors not raised in the trial court or on appeal. Our Supreme Court has since clarified when an appellate court

(continued…)

*Id.* at 1056. *See State v. Tillman*, 750 P.2d 546, 551 (Utah 1987) (plurality opinion), *disagreed with on other grounds by State v. Hummel*, 2017 UT 19, 393 P.3d 314; Labrum, 2000 Utah L. Rev. at 541. And a few years later, in *State v. Cobo*, 60 P.2d 952 (Utah 1936), *criticized by State v. Mitchell*, 278 P.2d 618 (Utah 1955), when faced with an unpreserved issue raised for the first time on appeal, the Court extended the exception articulated in *Stenback* beyond capital cases to also include "cases of grave and serious charged offenses and convictions of long terms of imprisonment, cases involving the life and liberty of the citizen."[5] *Id.* at 958. *See Tillman*, 750 P.2d at 551; Labrum, 2000 Utah L. Rev. at 541–42. In such cases, the Court further clarified that the exception allows appellate courts to notice and correct an unpreserved or waived error "when palpable error is made to appear on the face of the record and to the manifest prejudice of the accused." *Cobo*, 60 P.2d at 958. A few months later, the Court extended the exception to criminal convictions that would bring the defendant "into public contempt and disrepute of great intensity." *State v. Waid*, 67 P.2d 647, 652 (Utah 1937). *See* Labrum, 2000 Utah L. Rev. at 543. Finally, the following year, the Court suggested that the exception extended to all criminal cases. *State v. Arnold*, 79 P.2d 87, 87 (Utah 1938). *See* Labrum, 2000 Utah L. Rev. at 543–44.

¶36   Over the next fifty years, our Supreme Court sporadically applied or considered the "palpable error" and "manifest prejudice" criteria articulated in *Cobo* but only in criminal cases. *See, e.g.*, *State v. Dubois*, 98 P.2d 354, 360 (Utah 1940); *State v.*

---

(…continued)
may address an issue sua sponte. *See State v. Johnson*, 2017 UT 76, ¶¶ 16, 40–53, 416 P.3d 443.

5. The *Cobo* court also noted that other jurisdictions had sometimes extended this exception to civil cases, but it did not address the role of the exception in the civil context in Utah. *See State v. Cobo*, 60 P.2d 952, 958 (Utah 1936), *criticized by State v. Mitchell*, 278 P.2d 618 (Utah 1955).

*Peterson*, 240 P.2d 504, 507 (Utah 1952); *State v. Sanchez*, 361 P.2d 174, 175 (Utah 1961) (stating that the standard may be applied "in serious criminal cases, under special circumstances, where the interests of justice so require"); *State v. Poe*, 441 P.2d 512, 515 & n.9 (Utah 1968) (citing *Cobo* in support of the proposition that although the error was not preserved, the court "will not allow such a technicality to influence its decision in a case such as this"); *State v. Wood*, 648 P.2d 71, 77 (Utah 1982) (stating that the standard is the "established rule" for direct appeals in capital cases). *See also State v. Kazda*, 545 P.2d 190, 193 (Utah 1976) (stating that the *Cobo* "exception is applied only rarely where there appears to be a substantial like[l]ihood that an injustice has resulted"). *But see Mitchell*, 278 P.2d at 621 ("[I]f no request is made for instructions on lesser offenses, and none is given, such failure to instruct is not reviewable as a matter of right on appeal.").

¶37 Although a product of the common law, a limited form of the plain error doctrine was eventually codified in rule 103 of the Utah Rules of Evidence (rule 103);[6] rule 19 of the Utah Rules of

---

6. Rule 103 was codified as rule 4 in the original Utah Rules of Evidence that our Supreme Court adopted in 1971. Labrum, 2000 Utah L. Rev. at 546. Rule 4 stated that "the court in its discretion, and in the interests of justice, may review the erroneous admission of evidence even though the grounds of the objection thereto were not correctly stated." Utah R. Evid. 4(b) (1971). *See* Labrum, 2000 Utah L. Rev. at 546. However, our Supreme Court interpreted the phrase "not correctly stated" to mean that the objection had to be "vague or incorrectly stated" and that the rule thus did not apply to wholly unpreserved evidentiary challenges. *See State v. McCardell*, 652 P.2d 942, 947 (Utah 1982) (quotation simplified). *See also State v. Lesley*, 672 P.2d 79, 81 (Utah 1983). In 1983, when rule 4 was repealed and replaced by rule 103, a substantive change was made permitting plain error review of unpreserved evidentiary challenges. *See* Labrum, 2000 Utah L. Rev. at 546–47. The earlier version of rule 103 stated,

(continued…)

Criminal Procedure (rule 19), *see* Labrum, 2000 Utah L. Rev. at 546–47; and rule 51 of the Utah Rules of Civil Procedure (rule 51). Rule 103 provides that, as concerns challenges to evidentiary rulings, "[a] court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved." Utah R. Evid. 103(e). Rules 19 and 51 provide for a more limited context in which the plain error standard applies, each stating that "[u]nless a party objects to an instruction or the failure to give an instruction, the instruction may not be assigned as error except to avoid a manifest injustice." Utah R. Crim. P. 19(e); Utah R. Civ. P. 51(f).[7] Accordingly, as will be discussed in

---

(…continued)
"Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Utah R. Evid. 103(d) (1985). *See also id.* R. 103(e) (2020) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved.").

7. An earlier version of rule 51 stated that "the appellate court, in its discretion and in the interests of justice, may review the giving or failure to give an instruction." Utah R. Civ. P. 51 (1985). In *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), our Supreme Court held that this clause of rule 51 "embodies the same concept" as rule 19's use of the term "manifest injustice." *See id.* at 799. And in 2002, this provision of rule 51 was amended to match the language of rule 19 verbatim. *See* Utah R. Civ. P. 51(d) (2002).

It is also worth noting that a much more expansive version of the plain error doctrine in the criminal context has been codified in the Federal Rules of Criminal Procedure than appears in rule 19, which is limited to jury instructions. *See* Utah R. Crim. P. 19. Namely, rule 52 of the Federal Rules of Criminal Procedure provides more generally that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b).

(continued…)

greater detail below, although there is no significant difference in their current application, the plain error doctrine historically is the product of two separate branches: the common law and codified rules.

¶38   In light of the aforementioned rules, subsequent cases further developed the plain error doctrine along lines that more closely resemble its current iteration. In *State v. Eldredge*, 773 P.2d 29 (Utah 1989), the defendant raised an unpreserved evidentiary challenge. *See id.* at 35. Our Supreme Court held that under rule 103, a court may take notice of a plain error if two requirements are met: "[F]irst . . . that the error be 'plain,' i.e., from our examination of the record, we must be able to say that it should have been obvious to a trial court that it was committing error," and "second . . . that the error affect the substantial rights of the accused, i.e., that the error be harmful." *Id.* In discussing the first requirement, the Court stated that "the premise of rule 103(d)[8] is that the ends of justice must not be lost sight of in the pursuit of procedural regularity and that when an error is plain, a trial court can legitimately be said to have had a reasonable opportunity to address and correct it, even in the absence of an objection." *Id.* at 36. And concerning the second requirement, the Court noted "that the harmfulness standard set forth in rule 103 is substantively identical to that of Utah Rule of Criminal

(…continued)
Conversely, like its Utah counterpart, the Federal Rules of Civil Procedure provide for plain error review only in the context of civil jury instructions. *See* Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved . . . if the error affects substantial rights.").

8. When our Supreme Court issued *State v. Eldredge*, 773 P.2d 29 (Utah 1989), the relevant provision of rule 103 was found in subsection 103(d), which has since been moved, with some minor adjustments in phraseology, to subsection 103(e). *Compare* Utah R. Evid. 103(d) (1985), *with id.* R. 103(e) (2020).

Procedure 30," *id.* at 35 n.9, which provides that "[a]ny error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded," Utah R. Crim. P. 30(a). A few years later, this standard evolved into its current form in *State v. Dunn*, 850 P.2d 1201 (Utah 1991), *abrogated on other grounds by State v. Silva*, 2019 UT 36, 456 P.3d 718, when the Court added a third element that had previously only been implied: that "an error exists." *See id.* at 1208; Labrum, 2000 Utah L. Rev. at 559.

¶39    A few days after issuing *Eldredge*, our Supreme Court issued *State v. Verde*, 770 P.2d 116 (Utah 1989), in which it addressed the "manifest injustice" standard of rule 19 concerning jury instruction errors in criminal cases. *See id.* at 121. The Court "conclude[d] that in most circumstances, the term 'manifest injustice' is synonymous with the 'plain error' standard expressly provided in Utah Rule of Evidence 103(d) and elaborated upon in *Eldredge*." *Id.* at 121–22. *See Johnson*, 2017 UT 76, ¶ 57 n.16 (stating that "in most circumstances the term 'manifest injustice' [in rule 19] is synonymous with the 'plain error' standard" but also noting that under rule 19, instructional errors in the criminal context can also be reviewed for ineffective assistance of counsel and exceptional circumstances) (quotation simplified). And a few years later, in *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), the Court held that rule 51's standard for reviewing unpreserved objections to civil jury instructions "embodies the same concept" as rule 19. *See id.* at 799. *See Jensen v. Sawyers*, 2005 UT 81, ¶ 61, 130 P.3d 325 ("We have interpreted manifest injustice [of rule 51] to be synonymous with plain error and that the same analytical model applies to [rule 51 and rule 19].").

¶40    Plain error review was first applied in the civil context in *D.B. v. Division of Occupational and Professional Licensing*, 779 P.2d

1145 (Utah Ct. App. 1989),[9] in which this court, applying rule 103, addressed an unpreserved evidentiary issue and determined that the petitioner suffered "substantial prejudice," warranting reversal. *See id.* at 1148–49. Next, our Supreme Court briefly addressed plain error in the context of instructional error under rule 51 in *Crookston*, but disposed of the appeal on the ground that the appellant had "not begun to make the showing required by rule 51." *See* 817 P.2d at 799. Shortly thereafter, Utah appellate courts began reviewing unpreserved issues for plain error in civil cases that either fell outside of the ambit of rule 103 and rule 51 or applied plain error review without discussion of the rules. *See, e.g.*, *Heslop v. Bank of Utah*, 839 P.2d 828, 839–40 (Utah 1992); *Classic Cabinets, Inc. v. All Am. Life Ins. Co.*, 1999 UT App 88, ¶ 17, 978 P.2d 465; *Larsen v. Johnson*, 958 P.2d 953, 956 (Utah Ct. App. 1998); *Davis v. Grand County Service Area*, 905 P.2d 888, 892–94 (Utah Ct. App. 1995), *abrogated on other grounds by Gillett v. Price*, 2006 UT 24, 135 P.3d 861. The question of whether the common law branch of plain error review was applicable in civil cases was not commented on until 2017, when our Supreme Court, without either endorsing or repudiating the practice, noted that there is an "ongoing debate about the propriety of civil plain error review" and indicated its willingness "to enter this debate" in an appropriate case. *See Utah Stream Access Coal. v. Orange Street Dev.*, 2017 UT 82, ¶ 14 n.2, 416 P.3d 553. Such a case had yet to present itself until now, and as discussed above, Utah appellate courts have continued to apply plain error review in civil cases where neither party challenged the practice.

¶41 Following our review of the development of and policy considerations behind the plain error standard in Utah, we

---

9. In some prior civil appeals, our Supreme Court reversed using the term "plain error" but under circumstances where the issue being reviewed was preserved. *See, e.g.*, *Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 60 (Utah 1986); *Kish v. Wright*, 562 P.2d 625, 629 (Utah 1977).

conclude that, unless expressly authorized by rule, *see, e.g.*, Utah R. Evid. 103(e); Utah R. Civ. P. 51(f), the plain error exception to our preservation rule does not properly extend to ordinary civil appeals. This is because the considerations for applying plain error review in the civil context do not weigh as heavily as they do in the criminal context, against the substantial considerations underlying our preservation rule: judicial economy and fairness. *See supra* ¶ 32.

¶42 The interests at stake in civil cases are generally not as fundamental as those at stake in criminal cases.[10] As noted above, plain error review first developed in criminal cases "involving the life and liberty of the citizen," such as capital cases and "cases of grave and serious charged offenses and convictions of long terms of imprisonment." *State v. Cobo*, 60 P.2d 952, 958 (Utah 1936), *criticized by State v. Mitchell*, 278 P.2d 618 (Utah 1955). Although this standard was originally limited to certain criminal appeals, it was eventually extended to all of them due to the significant liberty interests at stake in such cases. Conversely, the economic and property interests that are typically the subject of civil cases are not as fundamental as the

---

10. We recognize that some civil cases involve significant interests on par with those at issue in criminal cases, such as fundamental constitutional rights, termination of parental rights, and liberty interests in certain civil-criminal hybrid proceedings (e.g., probation revocation hearings). *See Follo v. Florindo*, 2009 VT 11, ¶ 16, 970 A.2d 1230 (stating that plain error review is available only in civil cases involving fundamental rights and in quasi-criminal cases). *See also In re A.M.*, 2009 UT App 118, ¶ 18 n.6, 208 P.3d 1058 (stating that parental termination hearings are civil in nature); *State v. Hudecek*, 965 P.2d 1069, 1071 (Utah Ct. App. 1998) (stating that probation revocation proceedings are civil in nature). We do not address whether and to what extent plain error review should apply in such cases.

liberty interests at stake in criminal cases.[11] *See United States v. Courtney*, 816 F.3d 681, 683 (10th Cir. 2016) (recognizing the higher interests at stake in criminal cases); *Deppe v. Tripp*, 863 F.2d 1356, 1364 (7th Cir. 1988) ("In civil cases where economic and property interests are usually at stake, as opposed to criminal cases where more substantial liberty interests are involved, a plain error doctrine is unneeded.").

¶43 Furthermore, the application of plain error review in ordinary civil cases prejudices the faultless party, who is then obliged to bear the additional financial burden of briefing the issues on appeal and dealing with a possible remand for a new

---

11. For this reason, many of the jurisdictions that apply plain error review in the civil context apply a stricter standard of review to civil cases than to criminal cases. *See, e.g.*, *United States v. Courtney*, 816 F.3d 681, 683 (10th Cir. 2016) ("We recognize that in all cases, the burden of establishing plain error lies with the appellant, however this burden is extraordinary and nearly insurmountable in civil cases.") (quotation simplified); *C.B. v. City of Sonora*, 769 F.3d 1005, 1016 (9th Cir. 2014) ("[T]he plain error standard of review in the civil context is similar to, but stricter than, the plain error standard of review applied in criminal cases."); *Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir. 1988) (stating that plain error review may be available in civil cases "*if* a moving party can demonstrate (1) that exceptional circumstances exist, (2) that substantial rights are affected, and (3) that a miscarriage of justice will result if the doctrine is not applied") (emphasis in original); *Wittenbrook v. Electronics Recycling Services, Inc.*, 104 N.E.3d 876, 885 (Ohio Ct. App. 2018) ("In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.") (quotation simplified).

trial or other proceeding so that their opponent might be relieved of an error the opponent's attorney could have raised at the time it occurred. *See Deppe*, 863 F.2d at 1361 ("Requiring a non-erring party to bear the burden of his opponent's errors may not be reasonable in many circumstances and in fact may constitute a miscarriage of justice."). This reasoning is squarely in line with the American system of litigation, under which "a party voluntarily chooses her attorney and therefore is generally bound by the acts or omissions of his or her attorney." *Menzies v. Galetka*, 2006 UT 81, ¶ 76, 150 P.3d 480. Indeed, having voluntarily chosen its attorney, a party cannot "avoid the consequences of the acts or omissions of this freely selected agent" by claiming that doing so "imposes an unjust penalty on the client," *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962), especially where alleviation of the "penalty" would impose a financial burden on the other party.

¶44    For the foregoing reasons, we hold that plain error review is not available in ordinary civil cases unless expressly authorized by rule. Accordingly, because no rule allows such a review in this case, we have no occasion to address Kelly's argument, raised for the first time on appeal, that Timber Lakes lacked statutory and contractual authority to conduct a nonjudicial foreclosure of the Property.

## II. Validity of the Trustee's Sale

¶45    "When title to real property is at issue, the need for finality is at its apex." *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 17, 391 P.3d 196 (quotation simplified). For this reason, "once a trustee sale is completed," and the trustee conveys a deed to the successful bidder, "the remedy of setting aside the sale will be applied only in cases which reach unjust extremes." *Id.* ¶ 20 (quotation simplified).

¶46    "[T]here are three categories of deeds: void, voidable, and valid." *Id.* A deed is void ab initio if it violates public policy. *Id.* ¶ 21. In such cases, the deed "cannot be ratified or accepted,

and anyone can attack its validity in court." *Id.* ¶ 20 (quotation simplified). To establish that a deed is void, the challenging party must make "a showing free from doubt that the [deed] is against public policy." *Ockey v. Lehmer*, 2008 UT 37, ¶ 21, 189 P.3d 51 (quotation simplified). And in determining whether a deed is against public policy, courts look to the following two factors: "1) legislative statements of public policy, and 2) whether the conveyance 'harmed the public as a whole.'" *Adamson*, 2017 UT 2, ¶ 21 (quoting *Ockey*, 2008 UT 37, ¶¶ 19, 23-24).

¶47   A deed is voidable when "the interests of the debtor were sacrificed or there was some attendant fraud or unfair dealing." *Id.* ¶ 22 (quotation simplified). "A voidable deed is valid against the world, because only the injured party has standing to ask the court to set it aside." *Id.* ¶ 20 (quotation simplified). But absent "evidence of fraud or other unfair dealing, the [debtor] is required to show he suffered prejudice from some defect in the sale," *id.* ¶ 23, and must also "establish a causal connection between the defect and the prejudice," *id.* ¶ 24. Furthermore, unless the debtor challenges the sale before title passes into the hands of a bona fide purchaser, *id.* ¶ 25, "the only remedy left to a [debtor] under a voidable deed is damages from the party causing the injury," *id.* ¶ 26.

¶48   Finally, if a deed "results from only inconsequential errors that do not affect the validity of the sale," i.e., errors that do not prejudice the debtor, the deed is valid and may not be set aside. *See id.* ¶¶ 20, 24.

¶49   Kelly argues that the district court erred in determining that the premature recordation of the Notice of Trustee's Sale did not render the sale of the Property void. Specifically, Kelly points out, a trustee is statutorily required to wait "at least three months" between recording a notice of default and recording a notice of sale. *See* Utah Code Ann. § 57-1-24 (LexisNexis 2020). This provides the trustor a "statutory right to cure the default, which . . . must be exercised during the three-month grace

period before a trustee's sale is held." *Adamson*, 2017 UT 2, ¶ 16 (quotation simplified). But here, the trustee recorded the Notice of Default on May 2, 2016, and recorded the Notice of Trustee's Sale in early July 2016—approximately one month short of the requisite three-month waiting period.

¶50 Kelly argues that the early recordation of the Notice of Trustee's Sale violated public policy because "the legislature imposed certain 'obligations' and 'restrictions'" on parties electing to proceed with nonjudicial foreclosures to protect the debtor. And, he asserts, "[t]he law is clear that a three-month grace period must be provided before a trustee's sale is held." Although Kelly correctly states the purpose behind the procedural requirements for trustee's sales, we disagree that the premature recordation of the Notice of Trustee's Sale rises to the level of violating public policy.

¶51 "The detailed procedural requirements for a trustee's sale of real property are intended to protect the debtor/trustor," and "the objective of the notice requirements is to protect the rights of those with an interest in the property to be sold." *Occidental/Nebraska Fed. Savings Bank v. Mehr*, 791 P.2d 217, 220 (Utah Ct. App. 1990) (quotation simplified). But a failure to adhere to procedural requirements does not automatically rise to the level of a public policy violation. Our Supreme Court has held that "failure of the trustee to strictly comply with the statutory requirements of the Trust Deed Act" renders the deed issued following the nonjudicial foreclosure sale at most voidable, and the debtor is still required to show prejudice and "a causal connection between the defect and the prejudice" before the deed will be set aside. *Adamson*, 2017 UT 2, ¶ 24. *See Timm v. Dewsnup*, 2003 UT 47, ¶ 37, 86 P.3d 699 ("Whatever irregularities [the debtor] may allege in the technicalities of the notice requirement, they are immaterial if she does not demonstrate that she was unable to protect her interests, or if there were a resulting effect of chilling the bidding and causing an inadequacy of price.") (quotation simplified).

¶52    Kelly contends that the trustee's failure to wait the full three-month period is not a mere technical violation. Indeed, he asserts that "the assumption that the trustor would use this full time was the basis for the Utah Supreme Court holding that in most cases a trustee's deed cannot be voided for 'technical defects' in the foreclosure process after the foreclosure sale." In support of this contention, he points to the Court's statement that the requirement "that a trustor assert her rights before the trustee's sale . . . is consistent with the statutory right to cure the default, which also must be exercised during the three-month grace period before a trustee's sale is held." *Adamson*, 2017 UT 2, ¶ 16 (quotation simplified). He further asserts that if failure to adhere to the prescribed timeframe were not against public policy, there would be "nothing to constrain the [sale] of property by reducing the time period prescribed by [the] Utah Trust Deed Act by 40 days or even 60 days" and that "the notice could arguably then be slashed to 24 hours." We disagree.

¶53    Where irregularities in the procedure are at issue, absent "exceptional circumstances, the proper remedy is to seek an injunction prior to a sale, which allows a debtor to challenge irregularities and protect her rights before the sale is completed and a trustee's deed is executed and delivered to the purchaser." *Reynolds v. Woodall*, 2012 UT App 206, ¶ 15, 285 P.3d 7. *See Adamson*, 2017 UT 2, ¶ 16 ("A trustor may by acquiescence and failure to assert his rights at the proper time be estopped to set up irregularities in the foreclosure proceedings to defeat rights of the purchaser.") (quotation simplified). We would thus agree with Kelly that a deed violates public policy if the three-month period is reduced to such a degree as to amount to an exceptional circumstance, meaning the trustor, once notified, lacked a reasonable time in which to enjoin the foreclosure. *See RJW Media, Inc. v. CIT Group/Consumer Fin., Inc.*, 2008 UT App 476, ¶ 30, 202 P.3d 291 (stating that "the trial court should have concluded that [the] trustee's sale was void" because the trustee conducted a sale after it issued a notice of cancellation of a previously scheduled sale and conducted the newly scheduled sale without issuing a new notice of default and providing a new

three-month wait period). This approach balances the competing legislative purposes of protecting the debtor, *see Occidental/Nebraska*, 791 P.2d at 220 ("The detailed procedural requirements for a trustee's sale of real property are intended to protect the debtor/trustor.") (quotation simplified), and the need for finality in transactions involving title to real property, *see Adamson*, 2017 UT 2, ¶ 17 ("When title to real property is at issue, the need for finality is at its apex.") (quotation simplified).

¶54 Here, following a bench trial, the district court specifically found, and we quote:

- Aside from making contact with Timber Lakes and its legal counsel and asking them to postpone the sale, [Kelly] took no affirmative action to enjoin the trustee's sale.

- Mr. Kelly testified at the trial that he had family and friends who were available to him to either help him provide evidence of his claimed payments or to present payment to Timber Lakes. He chose not to have them do so.

- Mr. Kelly could have tendered payment, reserving his rights to challenge Timber Lakes' position as to nonpayment, [thereby] preventing the sale from proceeding.

- During his communications with Timber Lakes, Mr. Kelly made reference to having counsel, but he did not instruct counsel to act on his behalf to seek to enjoin the trustee's sale.

Based on these findings, which Kelly does not challenge on appeal, it is clear that the early recordation of the Notice of

Trustee's Sale was not so premature as to prevent Kelly from acting to protect his interests in the Property.

¶55 This court addressed a similar situation in *Occidental/Nebraska*. In that case, the trustee recorded an amended notice of default on September 9, 1985, to correct an omission of three lots in the original notice's property description, which it had recorded approximately six weeks earlier. *See* 791 P.2d at 218–19. The trustee mailed a notice of trustee's sale on November 13—approximately one month short of the 3-month waiting period. *See id.* at 219. Following sale of the property, the trustee, dissatisfied with the price it paid at its own sale, moved to set the sale aside as invalid on the ground that "only two months elapsed from the filing of the amended notice of default until the notice of the . . . sale was sent." *See id.* This court first determined that although the original notice of default failed to include three lots in the property description, the original notice nonetheless met the statutory requirements and "was sufficient to alert those with an interest in the trust property of impending foreclosure." *Id.* at 220. Alternatively, the court held that although the notice of the trustee's sale was sent only two months after the amended notice of default, "the only kinds of defects in the notice of a foreclosure sale that will justify a renunciation of the sale are those that would have the effect of chilling the bidding and causing an inadequacy of price." *Id.* at 221 (quotation simplified). And although the trustee "failed to comply strictly with the procedural requirements that should precede a trustee's sale[,] . . . the steps taken afforded all parties the rights and protections the statutory requirements for a nonjudicial foreclosure were intended to ensure." *Id.*

¶56 Kelly contends that *Occidental/Nebraska* is distinguishable from the present case because "[i]n that case, the property owner had the full 'protection period' prior to sale on the property." Specifically, he points to this court's holding that the original notice of sale—sent more than three months prior to the second notice of sale—served as sufficient notice to the trustors. *See id.* at 220. Kelly is correct in that regard, but as described above, this

court alternatively held that although the notice of sale was sent prematurely, this defect in the notice did not justify setting the sale aside absent a showing of prejudice. *See id.* at 221. By so holding, this court necessarily determined that an inadequate wait-period rendered the trustee's deed at most voidable—not void ab initio, as Kelly asserts.

¶57 For these reasons, we conclude that the premature recordation of the Notice of Trustee's Sale was not against public policy and thus the trustee's deed of sale was not void ab initio. The deed is at best voidable, but because Kelly does not challenge on appeal the district court's holding that the deed was not voidable, we have no occasion to further consider Kelly's challenge to the deed based on the insufficient wait-period.

### III. First to Breach

¶58 The governing documents of a homeowners association, including the recorded CC&Rs and bylaws, "constitute a contract between the association and the property owners." *Swan Creek Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 44, 134 P.3d 1122. *See Workman v. Brighton Props., Inc.*, 1999 UT 30, ¶ 10, 976 P.2d 1209 ("Recorded restrictive covenants are enforceable against property owners who purchased land subject to those covenants.") (quotation simplified). And under the first to breach rule, "a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform" and "can neither insist on performance by the other party nor maintain an action against the other party for a subsequent failure to perform." *Backbone Worldwide Inc. v. LifeVantage Corp.*, 2019 UT App 80, ¶ 25, 443 P.3d 780 (quotation simplified).

¶59 At trial, Kelly argued that because Timber Lakes failed to wait the requisite three months before recording the Notice of Trustee's Sale, Timber Lakes was the first to breach the contract. Accordingly, he contended "that he was excused from paying

the dues that Timber Lakes alleged were due and owing." The district court rejected this argument, stating that Kelly's "argument ignores the reason for the Notice of Default . . . and the Notice of Trustee's Sale in the first place"—that Kelly "had failed to pay his homeowners' dues." The court held that Kelly's "failure would constitute a breach of contract which would be first in time before any of the actions taken by Timber Lakes."

¶60 Kelly contends that, "[i]n fact, exactly the opposite is true." Namely, he asserts that he "was excused from failing to pay all assessments owed by August 18, 2016, the date of the trustee's sale, because Timber Lake[s] had breached its contract in its failure to provide Kelly with additional time to pay the assessments that were owed, or challenge the trustee's [sale]." He explains that "the terms of the agreement . . . included a three-month cure period, in the event Timber Lakes commenced a nonjudicial foreclosure proceeding" and that "Timber Lakes' failure to give [him] enough time to pay his assessments excused [his] failure to pay the delinquent assessment before the trustee's sale was held." In support of his assertion that Timber Lakes had a contractual duty to provide the full three-month wait-period, Kelly points to, among other things, Timber Lakes' bylaws, which provide that "[i]t shall be the duty of the Board of Directors . . . [t]o supervise all officers, agents and employees of [Timber Lakes] and to see that their duties are properly performed." Kelly states that the board's duty to supervise extended to ensuring that those conducting the nonjudicial foreclosure on the Property complied with the governing statutes.

¶61 But, as applicable here, the CC&Rs and bylaws permit Timber Lakes to foreclose as a remedy for past due assessments. Both documents obligate property owners to pay annual and special assessments. They further provide that for assessments that are more than 90 days past due, Timber Lakes "may bring an action at law against the Owner personally obligated to pay the same or foreclose the lien against the property." Thus,

foreclosure as a means to collect on past due assessments is a contractual remedy invoked in response to Kelly's prior breach.

¶62 Kelly correctly asserts that he had a "statutory right to cure the default, which . . . must be exercised during the three-month grace period before a trustee's sale is held," *see Bank of Am. v. Adamson*, 2017 UT 2, ¶ 16, 391 P.3d 196 (quotation simplified), but this right was triggered only after Timber Lakes initiated nonjudicial foreclosure proceedings as a remedy for his existing breach in failing to pay assessments. Indeed, the three-month period is provided specifically for the purpose of curing an *already existing* default or breach. *See id.* Thus, any missteps undertaken during the foreclosure process occurred in the context of Timber Lakes' pursuit of a remedy in response to Kelly's initial breach. And Kelly does not cite any legal authority, nor are we aware of any, supporting the proposition that failure to properly execute a remedy, in and of itself, constitutes a breach of contract. For this reason, Kelly's argument is unavailing.[12]

---

12. Kelly also argues that Timber Lakes breached the implied covenant of good faith and fair dealing (the covenant). "The implied covenant of good faith and fair dealing . . . inheres in every contract." *Backbone Worldwide Inc. v. LifeVantage Corp.*, 2019 UT App 80, ¶ 16, 443 P.3d 780 (quotation simplified). It "prohibits the parties from intentionally injuring the other party's right to receive the benefits of the contract, and prevents either party from impeding the other's performance of his obligations by rendering it difficult or impossible for the other to continue performance." *Id.* (quotation simplified).

Kelly contends that Timber Lakes breached the covenant when it "fail[ed] to grant Kelly's request for additional time at the August 17, 2016 Board meeting." He asserts that because the value of the Property far exceeded the past due assessment amount and because Utah Code section 57-1-27 allowed Timber Lakes to postpone the sale for up to 45 days without having to

(continued…)

## IV. Attorney Fees

¶63     Both Kelly and Timber Lakes challenge the district court's attorney fees award. Kelly argues that the court misapplied the bad faith statute when it awarded Timber Lakes attorney fees "incurred from the point of the court's summary judgment ruling through trial and post-trial briefing on the attorney's fees issue." Timber Lakes cross-appeals, arguing that the court erroneously declined to award pre-summary-judgment attorney fees pursuant to the CC&Rs and bylaws. Finally, Timber Lakes seeks an award of attorney fees on appeal. We address each argument in turn.

### A.     The Bad Faith Statute

¶64     The bad faith statute provides that "[i]n civil actions, the court shall award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith[.]" Utah Code Ann. § 78B-5-825(1) (LexisNexis 2018). The bad faith statute "is narrowly drawn and not meant to be applied to all prevailing parties in all civil suits." *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 46, 86 P.3d 712 (quotation simplified). To that end, a court must determine that an action or defense is both "(1) without merit, and (2) not brought or asserted in good faith" before awarding attorney fees under the statute. *Id.*

---

(…continued)

re-notice it, "Timber Lakes' decision to deny that request was arbitrary and capricious and/or in bad faith." But merely declining to exercise discretion in a breaching party's favor does not rise to the level of taking action to "render[] it difficult or impossible for the other to continue performance." *Id.* (quotation simplified). Thus, Timber Lakes' decision not to postpone the sale for a second time did not violate the covenant.

¶65    An action or defense "is without merit if it is frivolous, is of little weight or importance having no basis in law or fact, or clearly lacks a legal basis for recovery." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 30, 61 P.3d 1009 (quotation simplified). "[A] finding of bad faith turns on a factual determination of a party's subjective intent." *Sonnenreich*, 2004 UT 3, ¶ 49. "A party acts in bad faith when he brings an action [or defense] and either (1) lacks an honest belief in the propriety of the activities in question, (2) intends to take unconscionable advantage of others, or (3) intends to or has knowledge of the fact that his actions will hinder, delay, or defraud others." *Wardley*, 2002 UT 99, ¶ 29. Thus, an unmeritorious action may still be "in good faith as long as there is an honest belief that it is appropriate and as long as there is no intent to hinder, delay, defraud, or take advantage of the other party." *Boyer v. Boyer*, 2008 UT App 138, ¶ 24, 183 P.3d 1068 (quotation simplified).

¶66    Kelly argues that the district court's finding of bad faith was in error because the "[b]ad faith must be relevant or material."[13] Specifically, he contends that "the 'forged receipt' was of negligible significance to the issues raised at trial" because even if he "had paid the $1,83[9] payment, Kelly still would have owed assessments." Instead, he asserts that his theory at trial was that "Timber Lakes breached the contract first by not giving him the time allowed by contract . . . to pay the assessments." Accordingly, he asserts that "essentially the same trial would have been . . . held irrespective of the legitimacy of the $1,83[9] payment."

---

13. Kelly also claims that Timber Lakes "failed to meet its burden that the claim lacks merit," but he does not support this assertion with any analysis or citation to authority. For this reason, he has not carried his burden of persuasion on this issue, and we have no occasion to address his challenge to the first prong of the bad faith statute. *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196.

¶67 This is at odds with the district court's view of the trial's necessity. In its order, the court specifically stated that Timber Lakes was entitled to attorney fees incurred from the point "the case continued solely because Kelly continued to maintain that he had paid the homeowners' association fees at issue in this case." The court stated that Timber Lakes would not have been entitled to attorney fees under the bad faith statute had the case ended when the court concluded on summary judgment that the trustee's deed was neither void nor voidable. But "Kelly continued to assert the payment of his HOA Fees in bad faith," the court determined, based on its finding that Kelly had forged the receipt on which he relied at trial.[14] The court further stated that "[t]he question of whether Kelly paid the HOA Fees or not was central to the breach of contract issue and the breach of duty [of] good faith and fair dealing." First, "because if he had not paid, he was the first-breaching party and would not be entitled to relief." And second, "with respect to the procedures being a potential breach of the contract documents, again, if he did not pay, he could not rely upon that because he was the first breaching party."

¶68 In any event, we review a district court's finding of bad faith for clear error. *See Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 16, 405 P.3d 807. Under that standard, "this court will affirm a finding of bad faith when there is sufficient evidence in the record to support a finding" of bad faith. *Id.* ¶ 35 (quotation simplified). *See Jensen v. Cannon*, 2020 UT App 124,

---

14. The bad faith statute refers to a party not *bringing* an action or defense in good faith. *See* Utah Code Ann. § 78B-5-825(1) (LexisNexis 2018). The district court here did not conclude that the action was not brought in good faith. Instead, it determined that the action was not *continued* in good faith after summary judgment was awarded to Timber Lakes. Because Kelly does not challenge the application of the statute under these circumstances, we assume, without deciding, that the bad faith statute applies if the elements are otherwise met.

¶ 44, 473 P.3d 637 ("We . . . will reverse [a court's bad faith] finding only if it is against the clear weight of the evidence or we otherwise reach a firm conviction that a mistake has been made.") (quotation simplified). Moreover, "because the good faith element implicates fact-intensive questions about the losing party's subjective intent, a lower court's finding on this element typically will be afforded a substantial measure of discretion." *Linebaugh v. Gibson*, 2020 UT App 108, ¶ 23, 471 P.3d 835 (quotation simplified).

¶69    Here, the district court's finding of Kelly's bad faith was based on his submission of a forged receipt at trial. Thus, even assuming that "essentially the same trial would have been . . . held irrespective of the legitimacy of the $1,83[9] payment" as Kelly asserts, the relevancy of the forged receipt went toward Kelly's subjective intent in pursuing the remaining claims that were not dismissed on summary judgment. And Utah appellate courts have repeatedly held that a party's proffer of untruthful evidence is sufficient to pass clear error review of a bad faith finding. *See Wardley*, 2002 UT 99, ¶ 29 ("Wardley automatically lacked an honest belief in the propriety of bringing a suit to collect a commission under a fraudulently-obtained listing agreement."); *Topik v. Thurber*, 739 P.2d 1101, 1104 (Utah 1987) ("[T]he trial court's findings that defendant's defense was partially in bad faith and that his testimony constituted 'willful falsehoods' support the court's decision to award attorney fees in this case, and in accordance with the applicable standard of review, we do not disturb those findings.") (footnote omitted); *Blum v. Dahl*, 2012 UT App 198, ¶ 13, 283 P.3d 963 ("The trial court's belief that [the plaintiff] testified untruthfully is sufficient to support a finding of bad faith, and we will not disturb it on appeal.") (quotation simplified); *Gallegos v. Lloyd*, 2008 UT App 40, ¶ 17, 178 P.3d 922 (same).

¶70    Accordingly, we conclude that the district court did not clearly err in finding that Kelly proceeded to trial on his remaining claims in bad faith.

B.      The CC&Rs and Bylaws

¶71     In its cross-appeal, Timber Lakes asserts that under the CC&Rs and bylaws, it is contractually entitled to the remaining attorney fees it incurred in this litigation. "If the legal right to attorney fees is established by contract, Utah law clearly requires the court to apply the contractual attorney fee provision and to do so strictly in accordance with the contract's terms." *Express Recovery Services Inc. v. Olson*, 2017 UT App 71, ¶ 8, 397 P.3d 792 (quotation simplified). Additionally, "we interpret the provisions of [governing documents] as we would a contract." *View Condo. Owners Ass'n v. MSICO, LLC*, 2005 UT 91, ¶ 21, 127 P.3d 697.

¶72     Under the CC&Rs, each property owner within Timber Lakes Estates "is deemed to covenant and agree to pay to" Timber Lakes annual and special assessments, both of which, "together with interest, costs and reasonable attorney fees shall be a charge on the land and shall be a continuing lien upon the property against which each assessment is made." The CC&Rs further provide that Timber Lakes "may bring an action at law against the Owner personally obligated to pay the [assessments] or foreclose the lien against the property." Similarly, Timber Lakes' bylaws provide,

> Any assessments which are not paid when due shall be delinquent. If the assessment is not paid within ninety (90) days after the due date, . . . [Timber Lakes] may bring an action at law against the Owner personally obligated to pay the same or foreclose the lien against the property; and interest, costs and reasonable attorney fees of any such action shall be added to the amount of such assessment.

The district court denied Timber Lakes' request for attorney fees incurred prior to the summary judgment phase under the CC&Rs and bylaws, stating that the documents "are drafted to

apply to collection efforts up to and including foreclosure," which fees Timber Lakes already recovered via foreclosure.

¶73   Timber Lakes asserts that because its "various claims and defenses all hinged on validating the prior foreclosure and establishing that Kelly did in fact fail to pay his annual assessments," its efforts in this case were "essentially a collection action to retain the funds it had recovered to pay Kelly's unpaid fees." And "[i]n that respect, [its] counterclaim is 'an action at law against [an] Owner personally obligated to pay' annual assessments." It further argues that "the counterclaim also involves efforts to 'foreclose the lien against' Kelly's property" because "had Kelly prevailed on his claims, the foreclosure sale would have been declared invalid, and he would have regained title to the property." And "[h]ad Kelly complied with the proper procedure" of seeking an injunction prior to the trustee's sale, "it would have allowed [Timber Lakes] prior to the Sale to seek fees and costs for litigating Kelly's foreclosure defenses and allegations relating to unpaid assessments."

¶74   But the CC&Rs and bylaws do not contain language creating a contractual right to attorney fees for "any action arising from" the aforementioned collection efforts, or something similar. Instead, the attorney fee provisions in the governing documents are strictly limited to collection efforts on past due assessments, either through initiating an action against the owner or through foreclosing on the owner's property. Indeed, the provisions grant the right to attorney fees only in collection actions or foreclosure proceedings specifically initiated as a result of assessments being more than 90 days past due. The documents are entirely silent as to attorney fees in actions that arise after the aforementioned actions or foreclosure proceedings are completed, as was the case here. For this reason, because courts must "apply the contractual attorney fee provision . . . strictly in accordance with the contract's terms," *Express Recovery Services*, 2017 UT App 71, ¶ 8 (quotation simplified), the district court did not err in denying Timber Lakes' request for additional attorney fees based on the CC&Rs and bylaws.

C.      Attorney Fees on Appeal

¶75    Lastly, Timber Lakes requests an award of attorney fees incurred on appeal. "Generally, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 38, 405 P.3d 807 (quotation simplified). This principle likewise "applies when the basis for attorney fees in the trial court is the bad faith statute." *Id.* (quotation simplified). Accordingly, because Timber Lakes was awarded attorney fees below for defending against, as relevant here, Kelly's first-to-breach argument and claim for breach of the covenant, we grant Timber Lakes' request, but limit the award to attorney fees reasonably incurred in defending the district court's holdings on those two issues.

CONCLUSION

¶76    We affirm the district court in every respect and remand for the sole purpose of calculating an award for Timber Lakes' attorney fees reasonably incurred on appeal in addressing Kelly's first-to-breach and implied covenant of good faith and fair dealing arguments.

———————